

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-13-00210-CR
_____

KENNEDY DEWAYNE RILEY, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 202nd District Court
Bowie County, Texas
Trial Court No. 13F0131-202

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss

# OPINION

Kennedy Dewayne Riley was tried before a jury in Bowie County for the capital murder of Troydricus Lamar Robinson, found guilty, and sentenced to life in prison. On appeal, Riley alleges that flaws in the jury charge caused him egregious harm. Because (1) the jury charge contained errors and (2) Riley suffered egregious harm from jury charge error, we reverse the trial court's judgment and remand this cause for a new trial.

The jury charge in this case contained a few alleged errors, not made the subject of any objection at trial but now asserted on appeal.[1] The charge lacked the elements of the aggravating felony of robbery, a culpable mental state when discussing Riley's potential responsibility as the primary actor, and an aggravating felony or identity of the victim in the application section when discussing Riley's potential responsibility as a party. It also contained conflicting instructions on the required mental state. Riley faults the charge for failing to accurately "set forth the law applicable to the case." *See* TEX. CODE CRIM. PROC. ANN. § 36.14 (West 2007). The result, he says, was to allow the jury to come to a conclusion without ever knowing on what facts they could base that conclusion, thus violating his right to a fair trial. *See Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994).

Our review of alleged jury charge error involves a two-step process. *Id.* Initially, we determine whether an error occurred and then, if error occurred, determine whether the error was

---

[1]In his brief, Riley makes a formal point of error only of his complaint regarding the lack of a correct instruction requiring a finding of the requisite mens rea. He also complains, however, that "[t]he charge never defines the aggravating circumstances required for capital murder as the State alleged Appellant committed it, thereby failing to set forth the law applicable to the case and calling upon the jury to fulfill their fact-finding role without telling them which facts to find." Since this issue was briefed by both Riley and the State, we will address it. Riley also complains that there were errors in the party-liability paragraph, that the jury received "conflicting and erroneous definitions likely to confuse them," and that these errors compound the harm caused by his first point of error.

sufficiently harmful to require reversal.  *Id.* at 731–32; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g).  The harm required for reversal depends on whether the defendant properly objected.  *Almanza*, 686 S.W.2d at 172.  If a defendant does not object to the charge, reversal is required only if the harm is egregious, that is, if it denied the defendant a "fair and impartial trial," "go[es] to the very basis of the case," "deprive[s] [the defendant] of a 'valuable right,'" or "vitally affect[s] his defensive theory."  *Id.*; *Rudd v. State*, 921 S.W.2d 370, 373 (Tex. App.—Texarkana 1996, pet. ref'd).  Neither party has the burden to show harm.  *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013).

*(1)*     *The Jury Charge Contained Errors*

The purpose of the jury charge is to instruct the jurors on all the law applying to the case.  *Abdnor*, 871 S.W.2d at 731.  Since it "is the instrument by which the jury convicts, [it] must contain an accurate statement of the law and must set out all the essential elements of the offense."   *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995).  In examining the charge for possible error, appellate courts "must examine the charge as a whole instead of a series of isolated and unrelated statements." *Id.*

Further, the purpose of the application paragraphs is to apply the relevant law, definitions found in the abstract, and general legal principles to the particular facts of the case.  *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012) (citing *Gray v. State*, 152 S.W.3d 125, 127–28 (Tex. Crim. App. 2004)).   Because the application paragraphs specify "the factual circumstances under which the jury should convict or acquit[, they are] the 'heart and soul' of the jury charge." *Id.* at 367 (quoting *Gray*, 152 S.W.3d at 128).  "A charge that does not apply

the law to the facts fails to lead the jury to the threshold of its duty: to decide those fact issues." *Williams v. State*, 547 S.W.2d 18, 20 (Tex. Crim. App. 1977).

In a capital murder case such as this one, the State must prove both that the defendant intentionally caused the death of an individual *and* that he "committed this intentional murder while in the course of committing or attempting to commit" the aggravating felony. *Patrick v. State*, 906 S.W.2d 481, 492 (Tex. Crim. App. 1995); *see also* TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2014); *Reyes v. State*, 84 S.W.3d 633, 636 (Tex. Crim. App. 2002); *Hughes v. State*, 897 S.W.2d 285, 295 (Tex. Crim. App. 1994). Hence, the elements of the underlying felony are necessary elements in proving capital murder.

Among Riley's complaints is that the jury charge fails to define robbery or attempted robbery as the aggravating felony, and thereby denies his right to have a jury determine this key element of this formulation of capital murder. In this case, Riley was charged with intentionally causing the death of Robinson while Riley "was then and there in the course of committing or attempting to commit the offense of robbery" of Robinson. Therefore, it was necessary that the jury be charged on the offense of robbery and attempted robbery. *Demouchette v. State*, 731 S.W.2d 75, 78–79 (Tex. Crim. App. 1986) (jury charge in capital murder case sets out law applicable to case to comply with Art. 36.14 when jury instructed on elements of robbery and attempted robbery); *see* TEX. PENAL CODE ANN. §§ 15.01(a), 29.02(a) (West 2011).

Although the application paragraph is that section of the charge that "specifies the factual circumstances under which the jury should convict or acquit," it need not set forth specifically all of the elements necessary to convict a defendant if those elements have been accurately set forth

4

in another section of the charge. *Vasquez*, 389 S.W.3d at 367; *see also Demouchette*, 731 S.W.2d at 78–79. In this case, however, robbery and attempted robbery are never defined in the charge, thus omitting an element of the offense. When an element of the offense has been omitted, there is jury charge error, and it is subject to harm analysis. *Olivas v. State*, 202 S.W.3d 137, 143 (Tex. Crim. App. 2006).

Riley also complains that the application section of the jury charge authorized the jury to find him guilty of capital murder without a finding of the required mens rea. In the application section of the charge, the following instruction is given:

> Liability as Primary Actor
> You must determine whether the state has proved the defendant committed the crime by his own conduct. To prove this, the state must prove, beyond a reasonable doubt, two elements. The elements are that—
> 1. The defendant, in Bowie County, Texas, on or about August 28, 2012, caused the death of Troydricus Lamar Robinson with a firearm; and
> 2. The defendant was then and there in the course of committing or attempting to commit the offense of robbery of Troydricus Lamar Robinson.
> If you all agree the state has proved, beyond a reasonable doubt, both elements 1 and 2 listed above, you must find the defendant "guilty."

Riley was indicted for the capital murder of Robinson under Section 19.03(a)(2) of the Texas Penal Code. As acknowledged by the State, what distinguishes this alleged capital murder from felony murder is the *intent* to kill. *See Threadgill v. State*, 146 S.W.3d 654, 665 (Tex. Crim. App. 2004) (citing *Fuentes v. State*, 991 S.W.2d 267, 272 (Tex. Crim. App. 1999)). Although felony murder may be an unintentional murder committed in the course of committing a felony, "capital murder includes an intentional murder committed in the course of robbery." *Id.* (citing *Fuentes*, 991 S.W.2d at 272); *see* Tex. Penal Code Ann. § 19.02(b)(3) (West 2011).

5

The application paragraph of the charge addressing Riley's potential liability as the primary actor allowed the jury to convict Riley of capital murder for merely causing the death, even if unintentionally, of Robinson during the robbery. In other words, it allowed the jury to convict Riley of *capital* murder using the lesser elements of *felony* murder. This is clearly error, unless the proper mens rea is set out elsewhere in the charge.

As stated earlier, the application paragraph need not specify all the elements necessary to convict a defendant, if those elements have been accurately set forth in another section of the charge. *Vasquez*, 389 S.W.3d at 367; *Dinkins*, 894 S.W.2d at 339. For instance, in *Dinkins*, the defendant was accused of capital murder, with the murder of another individual being the aggravating felony. The abstract section of the charge defined both capital murder and murder. The application paragraph did not contain a culpable mental state for the aggravating felony, but did refer to it as a murder.[2] *Dinkins*, 894 S.W.2d at 339. Since murder was defined in the charge and the application paragraph referred to both killings as "murders," the Texas Court of Criminal Appeals interpreted the charge as allowing conviction only if the jury found both killings were murders, as defined elsewhere in the charge. *Id.* The court thus held that the jury charge was not defective. *Id.* at 340.

---

[2]The application paragraph read as follows:

> intentionally or knowingly cause[d] the death of KATHERINE THOMPSON, by shooting here [sic] with a deadly weapon, to wit: a firearm; and the said [appellant] did then and there cause the death of an individual, SHELLY CUTLER, by shooting here [sic] with a deadly weapon, to wit: a firearm, and *both of said murders* were committed during the same criminal transaction, you shall find the defendant guilty of the offense of Capital Murder.

*Dinkins*, 894 S.W.2d at 339.

6

In this case, however, there is not a clear and accurate statement of the required mens rea when considering the charge in its entirety. The State argues that the correct mens rea was stated four times in the abstract section of the charge.[3] The charge, however, also contains an erroneous and confusing instruction in the abstract section regarding Riley's potential liability as the primary actor that compounded the error in the application paragraph addressing primary-actor liability. The instruction in the abstract section stated,

> Liability as Primary Actor
>
> A person commits an offense if the person intentionally *or knowingly* causes the death of an individual.
> To prove that the defendant is guilty of capital murder, the state must prove, beyond a reasonable doubt, two elements. The elements are that—
> 1. The defendant caused the death of an individual; and
> 2. The defendant was then and there in the course of committing or attempting to commit the offense of robbery.
> The defendant acts intentionally as required by this offense if it is his conscious objective or desire to cause the result of death.

(Emphasis added).

The State suggests that this tracks the Texas Criminal Pattern Jury Charge on primary actor liability and that it correctly states the required mens rea. But, while the instruction has similarities to the Texas Criminal Pattern Jury Charge, it fails to accommodate the use of the instruction to charge capital murder by changing the mens rea to intentional. *See* STATE BAR OF TEXAS, TEXAS CRIMINAL PATTERN JURY CHARGES—CRIMES AGAINST PERSONS § C4.4 (2011). Thus, when using this instruction for a capital murder case under this formulation of the offense,

---

[3]Two of these were prefaced with "the state contends" and contain the accusations of the State. Another is contained in the confusing instruction addressing liability as primary actor. It is not the quantity, but rather the quality and location of the instruction that is most pertinent in our analysis. *See Reeves v. State*, 420 S.W.3d 812, 819 (Tex. Crim. App. 2013).

the words "or knowingly" should be deleted from the introductory sentence. Here, they remain. In addition, just as in the primary-actor application paragraph, the required intentional mens rea for capital murder was omitted. The charge listed the two elements the State must prove as causing the death and being in the course of robbery or attempted robbery.[4] After leaving out the "intentional" element, the charge then defines "intentionally."

This instruction is susceptible to at least three interpretations by jurors: they could conclude that Riley was guilty of capital murder if he either intentionally *or* knowingly caused the death of Robinson, if he *merely* (without any mens rea) caused the death of an individual while committing or attempting to commit robbery, or if he intentionally caused Robinson's death, based on the last line. To the extent that jurors chose either of the first two interpretations, any conviction would be based on the elements of felony murder, not capital murder.

Since the abstract section contains contradictory instructions regarding the required mens rea, it cannot supply the necessary mens rea element omitted from the primary-actor application paragraph. Therefore, this also is a jury charge error.

*(2)      Riley Suffered Egregious Harm from Jury Charge Error*

Having found jury charge error, we now must determine the degree of harm, if any, these errors caused Riley. Since Riley did not object to these deficiencies in the charge, he must have suffered egregious harm before reversal is required. *Almanza*, 686 S.W.2d at 171. In determining whether there has been egregious harm, we consider (a) the jury charge as a whole;

---

[4]The correct elements would be: (1) the defendant caused the death of an individual, (2) *the defendant did this intentionally*, *and* (3) the defendant was then and there in the course of committing or attempting to commit the offense of robbery.

8

(b) the state of the evidence, including contested issues and the weight of probative evidence; (c) arguments of counsel, and (d) any other relevant information in the record. *Sanchez v. State*, 209 S.W.3d 117, 121 (Tex. Crim. App. 2006); *Taylor v. State*, 146 S.W.3d 801, 810 (Tex. App.—Texarkana 2004, pet. ref'd). Direct evidence of harm is not required to establish egregious harm. *Castillo-Fuentes v. State*, 707 S.W.2d 559, 563 n.2 (Tex. Crim. App. 1986); *Hill v. State*, 30 S.W.3d 505, 507–08 (Tex. App.—Texarkana 2000, no pet.).

We find that Riley suffered egregious harm because, although (A) not requiring a finding on robbery did not, alone, cause egregious harm, (B) not requiring a finding of an intentional state of mind caused egregious harm.

*(A)    Not Requiring a Finding on Robbery Did Not, Alone, Cause Egregious Harm*

On balance, after a review of the four areas we have considered, as set out below, there appears to have been little room in the evidence for disagreement that robbery was the purpose of the visit to Robinson the night of his shooting. Therefore, in light of the four areas of consideration, we conclude that the lack of a robbery finding, alone, did not cause egregious harm.

First, our analysis considers the charge as a whole. As stated earlier, neither the abstract nor the application paragraphs of the charge define or set forth the elements of robbery or attempted robbery. The primary-actor application paragraph purported to require the jury to find that Riley "caused the death" of Robinson "in the course of committing or attempting to commit the *offense* of robbery" of Robinson. (Emphasis added). However, by failing to define or set

9

forth the elements of the offense of robbery, the court failed to clearly inform the jury what essential facts it must find to convict Riley of this type of capital murder.

This error was compounded by the party-liability application paragraph.[5] This paragraph, in addition to omitting the identity of the alleged victim, omitted any reference to robbery, attempted robbery or *any* aggravating felony, thus allowing the jury to convict Riley of capital murder if it found that he solicited, encouraged, directed, aided, or attempted to aid Green in murdering an (unidentified) individual, without a finding beyond a reasonable doubt that Green was in the course of committing or attempting to commit robbery or any aggravating felony. As with the primary-actor paragraph, this would allow the jury to convict Riley of felony murder, but not capital murder.

Under both theories of liability (Riley as the primary actor and as a party), the charge allowed the jury to convict Riley without a finding on the elements of robbery, an essential element of this type of capital murder. *See Patrick*, 906 S.W.2d at 492. We believe this error deprived Riley of his valuable right of having the jury reach a finding on an essential element of

---

[5]This paragraph reads, in pertinent part, as follows:

> [Y]ou must next decide whether the state has proved, beyond a reasonable doubt, that the defendant is guilty because he is criminally responsible for the commission of a crime committed by the conduct of another person. This is the case if the state has proved, beyond a reasonable doubt, four elements. The elements are that—
> 1. In Bowie County, Texas, on or about August 28, 2012, Alicia Green caused the death of an individual with a firearm; and
> 2. Alicia Green did this intentionally and knowingly; and
> 3. The defendant solicited, encouraged, directed, aided, or attempted to aid Alicia Green to commit the offense of capital murder; and
> 4. The defendant acted with the intent to promote or assist the commission of the offense of capital murder by Alicia Green.

10

his capital murder charge, unless this harm is ameliorated by another factor. *See Sanchez*, 209 S.W.3d at 125.

We are convinced, primarily by the state of the evidence on robbery, that the harm from the lack of a robbery element in the charge was not egregious. The evidence against Riley consisted primarily of the testimony of his then girlfriend and confessed accomplice, Green. Green told the jury of how they planned to relieve Robinson of his "stash" of both drugs and money by Green promising to exchange sex with Robinson for some of his "weed." She testified that, when she expressed doubts about the plan, Riley said he "would have to shoot him then." After finding out where Robinson was staying, Green went there as planned. She smoked part of a marihuana cigarette and was getting nervous when Riley came in with a "long and old" Western-like gun. Riley ordered Robinson to lie on the floor and demanded money. Robinson said he only had $40.00 in his pockets and Riley said, "You think I'm playing, you think it's a joke, you don't think I would shoot you." When Green and Riley began arguing, Robinson took the opportunity to try to escape through the front door. Riley shot him as he reached the door and he staggered against the wall and door. Green and Riley then fled out the back door.

After being shot, Robinson made his way to Joseph Frost's house across the street and loudly banged on the door. Not granted entrance immediately, he moved to the end of the driveway of that house, where he collapsed. He remained alive long enough to make short statements to several first responders. Frost testified that he asked Robinson who had shot him and quoted Robinson as saying a lady came to his door and that a man with a do-rag followed her into his house. Officer Rusty McDuffie quoted Robinson as reporting that he had been shot

11

and robbed, that an "old girl" set him up, and that an "old boy" shot him. Officer Jacob Foster quoted Robinson as reporting that a black woman wearing a purple shirt set him up and a black man wearing a white tank top, black shorts, and a black bandana or do-rag shot him. Wake Village Fire Chief James Guyton quoted Robinson as reporting that a "bitch" who was named Tisha or a similar sounding name—Green testified she set up the evening's event—"set me up" and that a guy with her had "a beater on and a bandana." Shameetrice Gomer testified that she saw Riley with Green approximately an hour or so before the shooting, at which time Riley was wearing a white tank top, also known as a "wife beater." Gary Stringer, a neighbor who lived adjacent to the location of the shooting and a retired police officer, testified (1) that he saw a car fitting the description of Riley's car acting suspiciously with lights off, being parked just down the street from the shooting location around 10:00 p.m. that evening, (2) that a man who could have been Riley wearing a white tank top exited the car and walked in the direction of the shooting location, and (3) that the car had New Mexico license plates part of which looked like "Z67"—Riley's plates, instead, partially read "267." Wake Village Police Chief Ronny Sharp testified that the investigation revealed a large number of contacts between Green's cell phone and Robinson's cell phone in the hours before the shooting. And, finally, Green testified to all the details implicating Riley in the robbery effort and the shooting that evening.

There was also testimony by Green's mother, Kennial Jacobs, that tended to place Riley with Green in the vicinity of the crime scene shortly after the shooting. Jacobs testified that she picked up Riley and Green at some apartments located a few blocks from Robinson's house shortly after the shooting. She took them to Riley's car, which was parked less than two blocks

12

from the victim's house. In addition, the jury heard a recording of a telephone conversation between Green and Riley, made while she was in custody, that could be interpreted as confirming they were trying to cover up their involvement in the shooting.

Although Riley did not testify at trial, his attorney aggressively cross-examined every witness in an attempt to impeach their credibility and to contest Riley's involvement in the case. For instance, he focused on Green's plea agreement with the State and the multiple, contradictory statements that Green had given the police that at first denied involvement, then implicated a third party as the trigger man, and, finally, implicated Riley as the shooter. In addition, the jury heard the recorded statement of Riley in which he repeatedly denied any involvement, as he did in the telephone conversation with Green. Thus, the evidence against Riley was contested. However, the main defense strategy was to contest whether Riley was present, not whether robbery was the purpose of the actions that night. And the question of his presence was not in serious doubt, given the evidence.

Riley waived his argument, so the only argument we have to consider is the State's. The State's argument briefly outlined the evidence that it contended showed Riley committed or attempted robbery that night. It also stated that it had to prove that Riley "was in the course of committing or attempting to commit the offense of robbery." However, it never informed the jury what facts or elements it had to prove to enable the jury to find that Riley was either committing or attempting to commit the offense of robbery. Thus, the State's argument did nothing to ameliorate the harm caused by the erroneous jury charge. However, neither did the State's argument add to the harm by misleading the jury or misstating its burden of proof.

13

We see nothing above or otherwise in the record that convinces us that the failure to define robbery, standing alone, was egregiously harmful to Riley.

*(B)      Not Requiring a Finding of an Intentional State of Mind Caused Egregious Harm*

We conclude differently as to the absence of any requirement that the jury find an intentional state of mind to convict Riley of capital murder.

The structure of the jury charge allowed the State to argue and the jury to find that Riley was guilty of capital murder without finding that he intended to cause Robinson's death.  The abstract section contains three paragraphs that could supply the correct mens rea.[6]  The first two are in the section discussing the accusations of the State and its two alternate theories of liability (liability as the primary actor and as a party).  Both of these paragraphs are prefaced with "the state contends."  The second paragraph discusses the State's theory of party liability and would not be helpful to the jury in determining the applicable mens rea when considering Riley's role as the primary actor.  In addition, the first is not particularly helpful since, regardless of what the State contends, the jury relies on the trial court to set forth "what facts, if found by it, would constitute proof of the elements of the offense." *Williams*, 547 S.W.2d at 20.

The next paragraph, titled "Relevant Statutes," also states the correct mens rea.  It advises the jury that

> the state must prove, beyond a reasonable doubt, two elements, the elements are that—
> 1. The defendant intentionally caused the death of an individual; and
> 2. The defendant was in the course of committing or attempting to commit robbery.

---

[6]The fourth paragraph cited by the State is contained in the confusing primary-actor paragraph of the abstract, which was previously addressed.

14

This paragraph could have been used by the jury to supply the missing mens rea in the primary-actor application paragraph. Two factors weigh against this conclusion, however. First, this paragraph is immediately followed by the primary-actor instruction, which directly contradicts the mens rea element stated in the relevant-statutes paragraph. Second, the State's jury argument, addressed in the next section, reinforced the erroneous instruction requiring no mens rea.

As we have seen, the primary-actor paragraph is an imperfect rendition of the Texas Criminal Pattern Jury Charge on felony murder. The operative portion of the paragraph purports to set forth the elements the State must prove. Regarding the mens rea element, it says that the State need prove only that Riley caused a death, without requiring any mens rea. Further, since that paragraph was almost identical to the primary-actor application paragraph and had the same title, it would tend to capture the jury's attention. In comparing the two, the jury could have drawn any of three conclusions as to the mens rea requirement, two of which would have allowed the jury to convict Riley of capital murder using the elements of felony murder.

There is another, striking, aspect to the charge that further leads us toward our conclusion that there was egregious harm. Near the end of the charge, in the application section, when applying the law to the facts in considering Riley's responsibility as a primary actor, the charge erroneously advises the jury that the two elements of the offense are (1) causing Robinson's death—with no mention of the required intentional state of mind—while (2) in the course of a robbery or an attempted robbery. That portion of the charge then immediately concludes, "If you all agree the state has proved, beyond a reasonable doubt, both elements 1 and 2 listed above,

15

*you must find* the defendant 'guilty.'"    (Emphasis added).    Given the proof here of an indisputable death and a virtually indisputable robbery, the position of this language in the charge, and the forceful mandatory language from the court, the effect is to take charge and compel a guilty verdict on an improper basis.  That strongly suggests egregious harm.

This charge is unlike the charges in *Vasquez* and *Dinkins*, where clear definitions in the abstract could supply the element missing from the application.  *See Vasquez*, 389 S.W.3d at 367; *Dinkins*, 894 S.W.2d at 339.  Here, the necessary mens rea was variously set forth as "intentional," "intentional or knowing," and none at all.  Thus, the instructions were both misleading and confusing.  Under these circumstances, even a jury exercising its common sense would have a difficult task deciding which of these was the required mens rea.

The State argues that a finding of egregious harm in this case would encourage defendants to remain silent during the charge conference, "then attack convictions on appeal based on a typographical error which did not have any impact on their right to a fair and impartial trial."  We disagree.  First, as we have seen, the errors in this charge were far from mere "typographical errors."   *Cf. Gelinas v. State*, 398 S.W.3d 703, 708 (Tex. Crim. App. 2013) (plurality op.).  Rather, here there was the omission of multiple elements of the offense.  Further, omitting necessary elements of the offense from the jury charge is not harmless, as the State contends.  Rather, such omissions deprive a defendant of his or her right to have a jury determine all of the elements of the offense beyond a reasonable doubt.  *See Sanchez*, 209 S.W.3d at 125.

Including all the elements of the offense is essential to the trial court's duty to accurately "set forth the law applicable to the case."  TEX. CODE CRIM. PROC. ANN. § 36.14.  Further, it is the

16

State's burden to prove all of the elements of the offense beyond a reasonable doubt and to secure the verdict from the jury. Omitting essential elements of the offense goes to the very heart of the State's case.

"It is not the function of the charge merely to avoid misleading or confusing the jury: it is the function of the charge to lead and to prevent confusion." *Reeves*, 420 S.W.3d at 818 (quoting *William*, 547 S.W.2d at 20). This charge was both misleading and confusing regarding the required mens rea. As with the omission of the elements of robbery, Riley was deprived of having the jury reach a finding on essential elements of this type of capital murder.

Considering the jury charge in its entirety, this factor weighs heavily toward a finding that Riley was deprived of his valuable right to have a jury determine every element of the alleged offense and that he was deprived of a fair and impartial trial. *See Sanchez*, 209 S.W.3d at 122, 125 (instructing jury so that it was relieved of duty to find at least two elements of offense deemed egregious harm).

As set out above, the evidence did not focus on the robbery question. The intent to rob was almost a given. On the other hand, while the evidence would allow a jury to find an intent to kill, the jury could also reasonably find some lesser state of mind that would have dictated an acquittal on capital murder. Strong evidence did set up Riley as the shooter, but whether he had the purpose of killing Robinson was clearly open to interpretation. Allowing the jury to convict of capital murder on a simple finding of Riley's causing Robinson's death was a very important factor, in our view.

17

Even though the evidence was contested, this does not mean that there was not sufficient evidence for the jury to find Riley guilty of capital murder had it been correctly instructed. We think that a rational jury could have found beyond a reasonable doubt that Riley was guilty of capital murder. The evidence, however, would also support a conviction for felony murder. Although Green testified that Riley said that he "would have to shoot him then" and that Riley told Robinson, "You think I'm playing, you think it's a joke, you don't think I would shoot you," she never testified that Riley said he would kill Robinson or that he intended to do so. Further, Green testified that, when Riley shot Robinson, he staggered against the wall and door, then she and Riley fled out the back door. A jury considering Green's testimony could reasonably come to the conclusion that the shooting of Robinson (whether by Riley or by Green) was not with the intent to cause his death, but either "knowingly" (but not intentionally), with the intent "to cause serious bodily injury" or a reflexive action that was "clearly dangerous to human life." *See* TEX. PENAL CODE ANN. § 19.02(b)(1)–(3) (West 2011). Since the evidence would support a conviction of either felony murder or capital murder, it is impossible to determine which the jury intended, considering the jury instructions given by the trial court. Therefore, this factor also weighs in favor of a finding of egregious harm.

The jury argument suggests egregious harm from the lack of a required mens rea. Riley waived his jury argument, so the only one we need consider is the State's. In its final argument, the State concentrated on the credibility of the witnesses and stressed Riley's role as the alleged shooter. It mentioned that Riley and Green intended to rob Robinson of his "stash," but did not discuss the elements or facts the jury needed to find Riley guilty of capital murder. The State's

18

only reference to the elements the jury needed to find in order to convict Riley of the offense was as follows:

> Now, the elements of the offense are in your jury charge, and *we just have to prove that* [*Riley*] *caused the death of Troy Robinson* and that he was in the course of committing or attempting to commit the offense of robbery of Troy Robinson. Folks, we're there.

(Emphasis added).

In some instances, the State has been allowed to supply deficiencies in the charge by correctly arguing what is required under the law. *See, e.g.*, *Gelinas*, 398 S.W.3d at 709. In this case, however, the State did not supply the jury with a correct statement of the law that could guide them in their deliberations. Rather, it reinforced the erroneous jury charge that failed to clearly inform the jury what essential facts it must find to convict Riley of this form of capital murder.

Since the jury argument repeated and reinforced the jury charge error, this factor weighs heavily toward a finding that Riley was deprived of his valuable right to have a jury determine every element of the alleged offense and that he was deprived of a fair and impartial trial.

The fourth *Almanza* factor requires us to examine the record for any other relevant information. In its brief, the State urges us to give weight to its statements made in voir dire regarding mens rea and robbery. The State told the jurors that it had the burden to prove that Riley intentionally killed Robinson, but then followed that with stressing that "murder means that you intentionally or knowingly kill another person." It also told the jury, "Now, as it relates to the aggravating circumstance, robbery, the State has to prove that, as I indicated, in the course

19

of committing theft, intentionally or knowingly with the intent to obtain or maintain control of property, threaten or place another in fear of imminent bodily injury or death."

It is unlikely that the jury remembered any of these statements (made before they were empaneled to hear this case) with any accuracy after three days of testimony, receiving instructions from the court, and hearing the argument of counsel. We also note that the State's representations in regard to mens rea in voir dire would have only reinforced the confusion previously discussed. Further, its definition of robbery was incomplete. *See Demouchette*, 735 S.W.2d at 78–79.

The State also urges us to consider that the indictment charged Riley with "intentionally" causing the death of Robinson and that the jury found Riley guilty "as charged in the indictment" as evidence that the jury found that he intentionally caused the death of Robinson, citing *Dickerson v. State*, 759 S.W.2d 741 (Tex. App.—Beaumont 1988, pet. ref'd). However, the Beaumont court in *Dickerson* did a sparse *Almanza* analysis, and the basis for its conclusion is unclear. *Id.* at 742. The trial court in this case instructed the jury that "[t]he indictment cannot be considered in any way by the jury." Absent any evidence to the contrary, we presume that the jury followed the instructions of the trial court. *Miles v. State*, 204 S.W.3d 822, 828 (Tex. Crim. App. 2006). Therefore, we do not consider the jury signing a form verdict containing this boilerplate language as evidence that the jury found Riley intentionally caused the death of Robinson.

In this case, this factor has little, if any, bearing on the harm analysis.

20

The jury was instructed in such a way that it was not required to find at least two elements of the offense of this form of capital murder to be proven beyond a reasonable doubt before convicting Riley. We find that Riley was deprived of his valuable right to have a jury determination of every element of the alleged offense and that this deprived him of a fair and impartial trial.

We reverse the trial court's judgment and remand the cause to the trial court for a new trial.

Josh R. Morriss III
Chief Justice

Date Submitted:     September 2, 2014
Date Decided:       November 14, 2014

Publish