

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-24-00112-CR

JEFFREY RAY PORTER, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law
Harrison County, Texas
Trial Court No. 2023-0357

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

# MEMORANDUM OPINION

A Harrison County jury convicted Jeffrey Ray Porter of failing to identify himself while being a fugitive from justice, a class B misdemeanor. *See* TEX. PENAL CODE ANN. § 38.02(d)(1) (Supp.). After Porter pled true to the State's punishment-enhancement allegation, the jury assessed a sentence of 120 days' confinement in county jail and a $1,200.00 fine.

On appeal, Porter argues that the evidence is legally insufficient to support his conviction and that the trial court erred by omitting the definition of "legally arrested" in its jury charge. Because we conclude that legally sufficient evidence supported the jury's verdict and that Porter was not egregiously harmed by any alleged jury charge error, we affirm the trial court's judgment.

## I. Legally Sufficient Evidence Supports the Jury's Verdict

In his first point of error, Porter argues that the evidence is legally insufficient to support the jury's conclusion that he failed to identify himself.

### A. The Evidence at Trial

The evidence shows that Porter had a verbal altercation with Danielle and Preston Mauldin. Danielle testified that she was inside her home located on U.S. Highway 59 in Marshall, Texas, when she heard her four "horses neighing excessively." Danielle looked out her window and saw Porter "on horseback riding back and forth in front of [her] fence." According to Danielle, that caused her horses to run back and forth along the fence line. Danielle noticed that one of her horses "got [its hoof] hung in the fence" and asked her husband

2

to tell Porter to "please move along" while she attempted to back her horses away from the fence.

Preston testified that he asked Porter to move along. According to Preston, Porter responded by using "a lot of profanity at [him]" and by saying that he was on a "f[---]in' highway." Preston testified that Porter "started using profanity towards [his] wife." Danielle said that, instead of leaving, Porter told her it was "all [her] f[---]ing . . . fault" and that it would not have happened if she rode her horses. Danielle said she told Porter that he was harassing her, and he responded by challenging her to "call the f[---]ing cops." Danielle called the police.

According to Preston, Porter ran his horse in his direction to intimidate him. Eventually, Porter "ma[de] his way down the highway" but was stopped by the Harrison County Sheriff's Department (HCSD). After that encounter, William Jones, a lieutenant with the HCSD, returned to the Mauldins' home and spoke with Preston in a manner that indicated that the matter had been resolved.

After the officers left, Porter returned and again used profane language toward the Mauldins, which prompted their second call to the police. Danielle testified that she also called a neighbor who owned a horse farm to see if she knew Porter and that Porter reacted in the following manner:

> [Porter] was mimicking me and my phone call. He was imitating me and what I was saying. He was like, oh, poor me, poor pitiful me. And he was -- he had split reins and he was roping them and throwing them at my fence towards my horses who were still excessively running back and forth. Basically, just screaming profanities and cussing and saying, you know, this is all my fault. That he's going [to] teach my horses a better lesson than I could ever teach them, and things of that nature. Just cussing and calling us names.

3

Preston testified that Porter called Danielle a "p[---]y." Danielle testified that she was being harassed.

Matthew Argenbright, a patrol lieutenant with the HCSD, testified that he responded to the Mauldins' second call. Argenbright's body-camera footage, which was admitted into evidence, shows that Porter told Argenbright to "get the f[---] out of [his] face," when questioned about why he was back in front of the Mauldins' home. Argenbright told Porter that the Mauldins had called the police twice to report harassment. When asked for his last name, Porter said that he was not going to answer Argenbright's questions and became argumentative. At that point, Argenbright placed Porter in handcuffs for his safety due to Porter's "hostility and noncompliance."

Argenbright testified that he spoke to the Mauldins about Porter, that the conduct described by them constituted disorderly conduct, and that he informed Porter that he was being arrested for disorderly conduct. According to Argenbright, Porter still refused to give his name or answer any other questions. At that point, Argenbright told Porter that he was also going to be arrested for failure to identify himself. Argenbright testified that Porter's name was not uncovered until the book-in process, when officers discovered that he had two active warrants.

### B.    Standard of Review

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex.

Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)). "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007))).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* at 298 (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

"A person commits an offense if he intentionally refuses to give his name, residence address, or date of birth to a peace officer who has lawfully arrested the person and requested the information." TEX. PENAL CODE ANN. § 38.02(a) (Supp.). Here, the State alleged that Porter "knowing that Deputy Matt Argenbright was a peace officer, intentionally refuse[d] to give his name to Deputy Matt Argenbright, a peace officer who had lawfully arrested the defendant and requested the information and the defendant was a fugitive from justice."

5

## C. Analysis

Porter does not challenge that he was a fugitive from justice, that Argenbright was a peace officer, or that he refused to give his name to Argenbright when asked. Instead, Porter argues that the evidence is insufficient because there was no evidence that Argenbright had lawfully arrested him. Because ample evidence shows that Argenbright had probable cause to arrest Porter for disorderly conduct and that Porter refused to give his name after being informed of the arrest, we find the evidence sufficient to support the jury's verdict.

Argenbright responded to the scene after the Mauldins had called the police to report Porter's behavior. Initially, Argenbright told Porter that the Mauldins had reported harassing conduct and that he had just witnessed Porter circling in front of their residence on his horse. As a result, Argenbright began an investigative detention of Porter.[1] After Porter, who was still on his horse, cursed at Argenbright and refused to provide his name, Argenbright detained Porter for his safety.[2] Argenbright then spoke with the Mauldins and testified that he developed probable cause to arrest Porter for disorderly conduct after speaking with them.

There are several ways by which a person can commit the offense of disorderly conduct. The first manner is if "he intentionally or knowingly" "uses abusive, indecent, profane, or vulgar language in a public place,[3] and the language by its very utterance tends to incite an immediate breach of the peace." TEX. PENAL CODE ANN. § 42.01(a)(1) (Supp.). "[T]o be a breach of the peace[,] the act complained of must be one which disturbs or threatens to disturb the tranquility

---

[1]Porter does not argue any suppression issue related to the investigative detention or arrest.

[2]Porter raises no complaint about his detention due to officer safety.

[3]Porter, who was on the highway during his interactions with the Mauldins, agreed that he was in a public place.

6

enjoyed by the citizens." *Andrade v. State*, 6 S.W.3d 584, 590 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) (citing *Head v. State*, 96 S.W.2d 981, 983 (Tex. 1936) (op. on reh'g)). Whether there is a "breach of the peace depend[s] []on the surrounding facts and circumstances in the particular case." *Miles v. State*, 241 S.W.3d 28, 40 (Tex. Crim. App. 2007) (citing *Woods v. State*, 213 S.W.2d 685, 687 (Tex. 1948)). "[L]oud swearing or cursing in a public place" can be conduct that breaches the peace. *Andrade*, 6 S.W.3d at 590. Another manner through which a person can commit disorderly conduct is "unreasonable noise in a public place . . . or in or near a private residence that he has no right to occupy." TEX. PENAL CODE ANN. § 42.01(a)(5) (Supp.).

On appeal, Porter argues that to constitute an offense, the words must amount to "fighting words."[4] *In re J.A.P.*, No. 04-08-00453-CV, 2009 WL 700833, at *2 (Tex. App.—San Antonio Mar. 18, 2009, no pet.) (quoting *Ross v. State*, 802 S.W.2d 308, 314–15 (Tex. App.—Dallas 1990, no pet.)). "Fighting words are those words which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Ross v. State*, 802 S.W.2d 308, 315 (Tex. App.—Dallas 1990, no pet.). Fighting words "include profane, obscene, and threatening words." *Id.* (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 573 (1942)). "Language which is merely harsh and insulting does not generally rise to the level of 'fighting words[']; derisive or annoying words only rise to such level when they plainly tend to excite the addressee to a breach of the peace." *State v. Rivenburgh*, 933 S.W.2d 698, 701 (Tex. App.—San Antonio 1996, no writ) (quoting *Duran v. Furr's Supermarkets, Inc.*, 921 S.W.2d 778, 785 (Tex. App.—El Paso 1996, writ denied)). "The test is what men of common intelligence would understand would be

---

[4]We are not reviewing the sufficiency of the evidence to support a disorderly conduct conviction. Rather, we simply address whether Argenbright lawfully arrested Porter.

7

words likely to cause an average addressee to fight." *Ross*, 802 S.W.2d at 315 (finding that "mother f[---]er, a[--]hole, and f[---] you" constituted "direct[ed] profane and abusive language"); *see also In re J.A.P.*, 2009 WL 700833, at *1, *3 (finding that defendant's statement, "What the f—?" constituted profane language and that such profanity "provided a basis for finding probable cause that a disorderly conduct offense ha[d] been committed").

Here, Porter's disorderly conduct was not limited to his words. The record shows that Argenbright was investigating the Mauldins' complaints about behavior Argenbright labeled as harassment. Just before initializing contact with Porter, Argenbright witnessed Porter circling his horse in front of the Mauldins' home. Danielle testified about Porter's actions, which incited her horses and endangered one that had gotten its hoof caught in the fence. Preston testified that Porter charged at him on horseback to intimidate him. Further, ample evidence suggested that Porter used profane language toward Danielle in front of Preston that was likely to cause an average husband to fight and that the Mauldins reported Porter's language to Argenbright, giving him probable cause for Porter's arrest. *See Ross*, 802 S.W.2d at 315; *In re J.A.P.*, 2009 WL 700833, at *1, *3; *see also Rodgers v. State*, 500 S.W.3d 682, 684 (Tex. App.—Fort Worth 2016, no pet.) (finding that officer had probable cause to arrest for disorderly conduct when he saw and heard defendant yelling obscenities out of his car toward occupants of another vehicle); *Ste-Marie v. State*, 32 S.W.3d 446, 449 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (concluding that the utterance "Hey, b[----], what are you looking at?" provided sufficient articulable facts on which an officer could reasonably believe that appellant engaged in disorderly conduct).

8

After viewing all the evidence in the light most favorable to the jury's verdict, we conclude there was sufficient evidence to show that Argenbright had probable cause to lawfully arrest Porter for disorderly conduct. As a result, we overrule Porter's first point of error.

## II.    Porter Was Not Egregiously Harmed by Any Alleged Jury-Charge Error

In his second point of error, Porter argues that the jury charge failed to contain a definition of "legally arrested." Porter admits that there is no statutory definition for the phrase. Even so, Porter believes that a definition should have been included.

"We employ a two-step process in our review of alleged jury-charge error." *Murrieta v. State*, 578 S.W.3d 552, 554 (Tex. App.—Texarkana 2019, no pet.) (citing *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994)). "Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require reversal." *Id.* (quoting *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.)).

The trial court's jury charge should "distinctly set[] forth the law applicable to the case." *Walters v. State*, 247 S.W.3d 204, 208 (Tex. Crim. App. 2007) (quoting TEX. CODE CRIM. PROC. ANN. art. 36.14). "As a general rule, terms need not be defined in the charge if they are not statutorily defined." *Middleton v. State*, 125 S.W.3d 450, 454 (Tex. Crim. App. 2003). However, "words and phrases possessing a technical meaning are generally to be considered as having been used in their technical sense." *Medford v. State*, 13 S.W.3d 769, 772 (Tex. Crim. App. 2000). As a result, "terms which have a known and established legal meaning, or which have acquired a peculiar and appropriate meaning in the law, as where the words used have a

9

well-known common law meaning," like the term "arrest," should be defined by the jury charge. *Id.* *Medford* found that the jury in an escape-from-arrest case should have been given a definition of arrest. *Id.* Further, *Medford* found that the definition should be based on the common law because the statutory definition was unworkable. *Id.* (citing TEX. CODE CRIM. PROC. ANN. art. 15.22); *see State v. Sheppard*, 271 S.W.3d 281, 290 (Tex. Crim. App. 2008) (noting "[t]hat [Article 15.22], drafted long before *Terry v. Ohio*,[5] has been called 'legislatively obsolete' because it does not distinguish between custodial arrests and temporary detentions"). The Texas Court of Criminal Appeals has since expressed a general preference for statutory definitions or no definitions at all. *Beltran De La Torre v. State*, 583 S.W.3d 613, 617 (Tex. Crim. App. 2019) ("[A] trial judge should, as a general rule, avoid including non-statutory instructions in the charge because such instructions frequently constitute impermissible comments on the weight of the evidence."). While that is the general rule, the *Medford* line was left standing. *Id.* at 618 ("Although our recent cases are consistent in finding that non-statutory instructions are generally disfavored, this rule is not without exceptions.").

Consequently, for the purposes of our analysis, we will assume without deciding that a definition for "lawfully arrested" should have been provided.[6]

We next move to the question of harm. "The level of harm necessary to require reversal due to jury charge error is dependent upon whether the appellant properly objected to the error." *Murrieta*, 578 S.W.3d at 555 (citing *Abdnor*, 871 S.W.2d at 732). When, as here, the defendant

---

[5]392 U.S. 1 (1968).

[6]Though Porter asserts that "legally arrested" should have been defined for the jury, "lawfully arrested" is more consistent with the statutory language of the offense. *See* TEX. PENAL CODE ANN. § 38.02(a).

10

"did not object to the charge, we will not reverse [the judgment] unless the record shows the error resulted in egregious harm." *Id.* (citing *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005)). "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Id.* (quoting *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007)). "[T]he record must show that a defendant has suffered actual, rather than merely theoretical, harm from jury instruction error." *Ngo v. State*, 175 S.W.3d 738, 750 (Tex. Crim. App. 2005) (citing *Dickey v. State*, 22 S.W.3d 490, 492 (Tex. Crim. App. 1999)).

"In determining whether there has been egregious harm, we consider (a) the jury charge as a whole; (b) the state of the evidence, including contested issues and the weight of probative evidence; (c) arguments of counsel[;] and (d) any other relevant information in the record." *Riley v. State*, 447 S.W.3d 918, 925 (Tex. App.—Texarkana 2014, no pet.) (citing *Sanchez v. State*, 209 S.W.3d 117, 121 (Tex. Crim. App. 2006)). Porter does not allege that there are any other errors in the jury charge, and we note that the application paragraph of the charge required the jury to find that Argenbright lawfully arrested Porter. Porter argues that egregious harm is established because his closing argument focused almost exclusively on the issue of whether the arrest was lawful. However, the jury's verdict indicated a rejection of Porter's arguments, which weighs against a finding of egregious harm. Moreover, with respect to the question of whether Porter's arrest was lawful, the facts were not in dispute at trial. Rather, the dispute was "with respect to the legal significance of what [were], in essence, undisputed facts." *Robinson v. State*, 377 S.W.3d 712, 720 (Tex. Crim. App. 2012). As a result, the question of probable cause for

11

"lawfully arrested" was a legal question for the trial court. *See id.*; *State v. Ford*, 537 S.W.3d 19, 23 (Tex. Crim. App. 2017) ("[W]hether the facts . . . add up to reasonable suspicion or probable cause is a question to be reviewed *de novo*.").

Here, we have previously explained that Argenbright had probable cause to arrest Porter for disorderly conduct.[7] For these reasons, and because the record firmly established the other elements of failure to identify while being a fugitive from justice, we conclude that Porter was not egregiously harmed by the trial court's omission of a definition for "lawfully arrested." Accordingly, we overrule Porter's last point of error.

## III.    Disposition

We affirm the trial court's judgment.


Jeff Rambin
Justice

Date Submitted:      October 1, 2024
Date Decided:        October 30, 2024

Do Not Publish

---

[7]We note that the trial court received a note from the jury asking, "[W]hat's the definition of lawfully arrested?" The trial court informed the parties that it would respond by saying that "the Court cannot answer your questions." The trial court asked Porter's attorney if he had any objection to that response, and Porter's counsel replied, "No objection, Your Honor." Now, Porter argues that the jury question should weigh in a finding of egregious harm, but we reject that argument because we find that Argenbright had probable cause to arrest Porter.