ACCEPTED
13-15-00310-CR
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
11/23/2015 6:09:01 PM
Dorian E. Ramirez
CLERK

CAUSE NO. 13-15-00310-CR

_____

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
11/23/2015 6:09:01 PM
DORIAN E. RAMIREZ
Clerk

IN THE COURT OF APPEALS
FOR THE THIRTEENTH DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

_____

SANTOS SALINAS, JR. §
 §
v. §
 §
THE STATE OF TEXAS §

_____

APPELLANT'S BRIEF

_____

Justin Bradford Smith
Texas Bar No. 24072348
Harrell, Stoebner, & Russell, P.C.
2106 Bird Creek Drive
Temple, Texas 76502
Phone: (254) 771-1855
FAX: (254) 771-2082
Email: justin@templelawoffice.com

ATTORNEY FOR APPELLANT

ORAL ARGUMENT REQUESTED

1

# IDENTITY OF PARTIES AND COUNSEL

**Appellant**
Santos Salinas, Jr.

**Appellant's Counsel**
Justin Bradford Smith
Harrell, Stoebner, & Russell, P.C.
2106 Bird Creek Drive
Temple, Texas 76502
Phone: (254) 771-1855
FAX: (254) 771-2082
Email: justin@templelawoffice.com

**Appellant's Trial Counsel**
Barton Joseph Vana
101 Highway 281 North, Suite 205C
Marble Falls, Texas 78654
Telephone:  830-385-2694
Email:  bart_vana@hotmail.com

**Appellee**
The State of Texas

**Appellee's Trial Counsel**
Richard S. Crowther
Robert Blake Ewing
Burnet County Assistant District Attorney
1701 East Polk Street, Suite 24
Burnet, Texas 78611
Telephone:  512-756-5449
Fax:  (512) 756-8572

**Appellee's Appellate Counsel**
Gary W. Bunyard
Burnet County Assistant District Attorney
Address, Phone, and Fax Same As Above
Email:  g.bunyard@co.llano.tx.us

# TABLE OF CONTENTS

Identity of Parties and Counsel…………………………..…………………………... 2

Table of Contents…………………………………………………………..…..3-6

Index of Authorities…………………………………………………………7-10

Statement of the Case…………………………………………………………….11

Issues Presented…………………………...…………………………………...11

     ISSUE ONE:   Because the investigative detention of Appellant was unlawful, the subsequent attempted arrest was also unlawful, and therefore the evidence is insufficient to support Appellant's conviction…………………………………..11

     ISSUE TWO:   Appellant suffered sufficient harm because the Article 38.23 instruction misstates the law on what justifies an investigative detention by an officer………………………11

Statement of Facts………………………………………..……………………11-20

     1.  The Incident…………………………………………………………11-16

     2.  Trial………………………………………………………………….16-20

Summary of the Argument…………………………..……………………...20-21

     ISSUE ONE:   Because the investigative detention of Appellant was unlawful, the subsequent attempted arrest was also unlawful, and therefore the evidence is insufficient to support Appellant's conviction…………………………………..20

Argument………………………………………………………….........21-48

Standard of Review……………………..……………………………....21-22

Law…………………………………………………….................22-28

    1. The offense itself…………………………………………………….22-23

    2. If the investigative or temporary detention preceding the attempted arrest is unlawful, the subsequent attempted arrest is unlawful, and the evidence is insufficient to support the conviction………….......23-24

    3. Three levels of police-citizen interactions………………………..24-25

    4. Distinguishing consensual encounters from investigative detentions………………………………………………………25-26

    5. The test for reasonable suspicion…………………………………26-28

Application…………………………………………………………………...28-48

  A. Detention……………………………………………………………..28-33

    1. Stewart and his fellow officer detained Appellant…………………..28-33

      a. Initial displays of authority……………………………………...28-32

      b. Submission to the initial show of authority……........................32-33

      c. Detention once Stewart moved Appellant to the front of the vehicle……………………………………………………...33

  B. Reasonable Suspicion………………………………………………..33-47

    1. No reasonable suspicion justified the detention……………………33-47

      a. Lack of reasonable suspicion based on the facts known upon the initial stop……………………………………………………...34-40

      b. Lack of reasonable suspicion at the time Stewart moved Appellant to the front of the vehicle……………………………………...40-47

  C. Legal Insufficiency…………………………………………………..47-48

Conclusion…………………………………………………………………...48

Summary of the Argument……………………………………………………….48-49

     ISSUE TWO: Appellant suffered sufficient harm because the Article 38.23 instruction misstates the law on what justifies an investigative detention by an officer……………………….48

Argument………………………………………………………………………50-68

Standard of Review…………………………………………………………….50-51

Application………………………………………………………………………51-54

    1. Using the phrase "articulable suspicion" rather than "reasonable suspicion", and failing to state that the officer must suspect criminal activity, is error……………………...………..51-54

Harm Analysis………………………………………………………………….54-68

    1. Appellant's rejected written request for an alternative Article 38.23 instruction is sufficient to preserve error, making the question in the harm analysis whether Appellant suffered *some—any—* actual harm………………………………………………………..54-57

    2. Appellant did not waive his requested instruction, and even if he did, it only changes the harm analysis………………………….57-59

    3. Appellant suffered some harm or egregious harm…………………..60-68

       A. Charge as a whole………………………………………………..60-63

       B. State of the evidence…………………………………………...63

       C. Arguments of counsel…………………………………………64-66

       D. Other considerations in the record…………………………......66-68

Conclusion…………………………………………………………………...68

Prayer………………….…………………………………………….........68

Certificate of Compliance……………………………………………...69

Certificate of Service………………………………………………...69

# INDEX OF AUTHORITIES

**United States Supreme Court:**

*California v. Hodari D.*, 499 U.S. 621 (1991)……………………………………….26

*Florida v. Bostick*, 501 U.S. 429 (1991)………………………………………25, n. 10

*Florida v. Royer*, 460 U.S. 491 (1983)……………………………………23, n. 9

*Jackson v. Virginia*, 443 U.S. 307 (1979)………………………………..21-22

*Illinois v. Wardlow*, 528 U.S. 119 (2000)…………………………………………40

*United States v. Mendenhall*, 446 U.S. 544 (1980)……………………………….29

*United States v. Sokolow*, 490 U.S. 1 (1989)……………………………….27, 45

**Federal Courts**

*United States v. Steele*, 782 F.Supp. 1301, 1309 (S.D. Ind. 1992)………………..32

**Court of Criminal Appeals:**

*Abdnor v. State*, 871 S.W.2d 726
    (Tex.Crim.App.1994)……………………………………….50, 62-63, 65-66

*Arline v. State*, 721 S.W.2d 348
    (Tex.Cr.App.1986)……………………………………...50, 54, 57, 63, 66-68

*Almanza v. State*, 686 S.W.2d 157
    (Tex. Crim. App. 1984)……………………………………..50-51, 54-63, 65-68

*Brooks v. State*, 323 S.W.3d 893
    (Tex. Crim. App. 2010)………………………………………….21, 35, 42-43

*Clayton v. State*, 235 S.W.3d 772
    (Tex. Crim. App. 2007)……………………………………………........22

*Crockett v. State*, 803 S.W.2d 308

(Tex. Crim. App. 1991)……………………………………………………..39, 65-66

*Derichsweiler v. State*, 348 S.W.3d 906
    (Tex. Crim. App. 2011)…………………………………27-28, 37-38, 46, 63

*Dinkins v. State*, 894 S.W.2d 330
    (Tex. Crim. App. 1995)………………………………………53-54, 61-62

*Ebarb v. State*, 598 S.W.2d 842
    (Tex. Crim. App. 1979)……………………………………………….30

*Francis v. State*, 36 S.W.3d 121
    (Tex. Crim. App. 2000)…………………………………………54-57

*Hawkins v. State*, 758 S.W.2d 255
    (Tex. Crim. App. 1988)……………………………………………….40

*Hooper v. State*, 214 S.W.3d 9
    (Tex. Crim. App. 2007)…………………………………………....21-22

*Hutch v. State*, 922 S.W.2d 166
    (Tex. Crim. App. 1996)……………………………………………...51, 59

*Johnson v. State*, 23 S.W.3d 1
    (Tex. Crim. App. 2000) (McCormick, P.J., dissenting)………………..35, 43

*Lippert v. State*, 664 S.W.2d 712
    (Tex. Crim. App. 1984)…………………………………………………47

*Murphy v. State*, 640 S.W.2d 297
    (Tex. Crim. App. 1982)………………………………………………51-53

*Reeves v. State*, 420 S.W.3d 812
    (Tex. Crim. App. 2013)………………………………………………..51

*Rodriguez v. State*, 578 S.W.2d 419
    (Tex. Crim. App. 1979)…………………………………21-23, 47-48, 61, 63, n. 9

*Simmons v. State*, 493 S.W.2d 937
    (Tex. Crim. App. 1973)………………………………………………..52

*State v. Garcia-Cantu*, 253 S.W.3d 236
(Tex. Crim. App. 2008)………………………..25-26, 28, 31-33, n. 10, n. 12

*State v. Woodard*, 341 S.W.3d 404
(Tex. Crim. App. 2011)…………………………………...24, 26, n. 9

*Stone v. State*, 703 S.W.2d 652
(Tex. Crim. App. 1986)………………………………………..53-55, 57

*Vasquez v. State*, 389 S.W.3d 361
(Tex. Crim. App. 2012)……………………………………………….62

*Wade v. State*, 422 S.W.3d 661
(Tex. Crim. App. 2013)…...22, 24-27, 32-33, 38-39, 43-44, 48-49, 53-54, 63

*Worthey v. State*, 805 S.W.2d 435
(Tex. Crim. App. 1991)………………………………………………….47

**Texas Courts of Appeals:**

*Brennan v. State*, 334 S.W.3d 64
(Tex. App.—Dallas 2009, no pet.)………………………...13-14, n. 5, n. 7

*Brown v. State*, 790 S.W.2d 357
(Tex. App.—Houston [14th Dist.] 1990, pet. ref'd)………………………..31

*Cook v. State*, 1 S.W.3d 722
(Tex. App.—El Paso 1999, no pet.)………………………………………..40

*Hartsfield v. State*, 305 S.W.3d 859
(Tex. App.—Texarkana 2010, pet. ref'd)………………………………..21

*Haymond v. State*, 01-92-01233-CR, 1993 WL 270525
(Tex. App.—Houston [1st Dist.] July 22, 1993, no pet.)
(not designated for publication)………………………………39, 45, n. 15

*Hernandez v. State*, 376 S.W.3d 863
(Tex. App.—Fort Worth 2012, no pet.)……………………..30, 32-33, 35-38

*Lewis v. State*, 15 S.W.3d 250
    (Tex. App.—Texarkana 2000, no pet.)………………………………….31

*Riley v. State*, 447 S.W.3d 918
    (Tex. App.—Texarkana 2014, no pet.)…………………………..62, 65-66

*State v. Ruelas*, 327 S.W.3d 321
    (Tex. App.—El Paso 2010, pet. ref'd)………………………..34, 39, n. 16

*White v. State*, 852 S.W.2d 53
    (Tex. App.—Texarkana 1993, no pet.)………………………………….30

**Constitutions/Statutes/Rules**

Tex. Pen. Code § 38.04(a)……………………………………………23, 60-61

Tex. Pen. Code § 38.04(b)(1)(A)………………………………………….23

Tex. Crim. Proc. Code art. 36.14…………………………………………..53

Tex. Crim. Proc. Code art. 36.15………………………………….52, 54-58

Tex. Crim. Proc. Code art. 38.23…………………...11, 48-49, 51-57, 61-63, 67-68

## STATEMENT OF THE CASE

Nature of the Case:      This is an appeal from a judgment of conviction for evading arrest or detention, with a prior conviction for the same, following a jury trial. (I C.R. at 53-54).

Judge/Court:      Judge J. Allan Garrett, sitting for the 424th District Court, Llano County. (I C.R. at 53-54).

Pleas:      Not Guilty. (I C.R. at 53) (V R.R. at 9).

Trial Court Disposition:      Following the jury's verdict finding Appellant guilty of evading arrest or detention with a prior conviction for the same, (I C.R. at 44; 53) (V R.R. at 54), the jury assessed punishment of five years in the Texas Department of Criminal Justice and a fine of $2,500, (I C.R. at 51; 53) (V R.R. at 105), and the trial court imposed the sentence. (V R.R. at 106) (I C.R. at 53-54).

## ISSUES PRESENTED

ISSUE ONE: Because the investigative detention of Appellant was unlawful, the subsequent attempted arrest was also unlawful, and therefore the evidence is insufficient to support Appellant's conviction.

ISSUE TWO: Appellant suffered sufficient harm because the Article 38.23 instruction misstates the law on what justifies an investigative detention by an officer.

## STATEMENT OF FACTS

### 1. The Incident

In December 2013, Officer Jeremy Stewart and his trainee were patrolling in their vehicle around 11:40 pm when, according to Stewart, a blue station wagon

11

parked in a car wash parking lot flashed its high beams at them. (V R.R. at 15-16; 22). Stewart turned his car around and, according to him, "as we approached the parking lot, the high beams were still being flashed." (V R.R. at 16). The video admitted into evidence and played for the jury does not show the high beams flashed the first time, nor does it show the high beams flashing the second time as the patrol car approaches and passes the parked vehicle. (State's Ex. 3; 00:01-00:26). Because of the "time of night", the fact that "it was December…[and] they were at a car wash",[1] and the fact that "when [the officers] passed, [the parked vehicle] flickered [its] headlights at us or high beams as if to signal us", Stewart was suspicious enough to stop. (V R.R. at 18).[2] However, Stewart did not approach or detain Appellant for a traffic violation. (V R.R. at 27).

Stewart pulled into the parking lot,[3] where, according to him, he "observed Mr. Salinas exit the vehicle and move quickly towards my patrol car and point

---

[1] On cross-examination, Stewart admitted that people in Burnet wash their cars in December, but insisted that he "hadn't seen anybody at that car wash that late at night in a long period of time." (V R.R. at 29). This long period of time was the eighteen months he had been on the night shift, which was also his entire term of employment with the City of Burnet Police Department. (V R.R. at 14; 29).

[2] This appears to be the import of Stewart's testimony, which came in response to a question designed to elicit whether the interaction between Stewart and Appellant, before Stewart patted Appellant down for the pill bottle, was a consensual encounter or a detention, and what facts Stewart found suspicious enough to justify his pat down. (V R.R. at 18). Stewart's response seems to range a bit broader than that, as he testifies to the facts preceding the stop itself. (V R.R. at 18).

[3] There is no indication that the patrol car's emergency lights or spotlight were ever activated; regarding the former, they are not, for example, reflected on the hood of the patrol car or otherwise, and the video displays text saying the lights (and the siren, for that matter) are not activated. (State's Ex. 3). Because the audio malfunctioned, (V R.R. at 20-21), it is possible the

west". (V R.R. at 16). Appellant was on his cell phone at that time, (State's Ex. 3; 00:27-00:38), a fact that, in Stewart's "experience",[4] when coupled with hand gestures or animation, could be used as a "decoy to throw us off track"—however, Stewart testified he "could not see if [Appellant] was on the phone." (V R.R. at 27). Stewart "quickly exited [his] vehicle and advised [Appellant] to go back to the vehicle that he exited." (V R.R. at 16).[5] Throughout the subsequent interaction, Stewart was wearing his "standard patrol uniform", his badge was displayed, his patches for the City of Burnet were displayed, and he was armed with his service weapon and magazines. (V R.R. at 25).

The video (which lacks audio) [6] does not show Appellant exit his vehicle, but neither does it show him moving quickly towards the patrol car. (State's Ex. 3; 00:26—00:31) (V R.R. at 21). It does show, however, Appellant respond

---

text is erroneous as well, but there is no way to know. In any event, there are no visual signs of the emergency lights, and no testimony that they were activated, so it is safe to conclude that they were off during the interaction.

[4] Stewart testified he had been an officer "[a]pproximately eight years and seven months." (V R.R. at 26).

[5] During opening statements, the State told the jury Stewart said, "You need to get back to the car". (V R.R. at 10). Likewise, during closing arguments Appellant's attorney placed these words in Stewart's mouth: "You, back to the car." (V R.R. at 45). The video lacks audio, so, because Stewart did not testify as to the words he used, these are the only indication of the substance of Stewart's command. (V R.R. at 21) (State's Ex. 3). Of course, it is an "indication" only, as it is "well-settled that statements made by counsel during opening and closing statements are not evidence." *Brennan v. State*, 334 S.W.3d 64, 74 (Tex. App.—Dallas 2009, no pet.). Still, the consensus is that Stewart ordered Appellant back to the car, whatever words he actually used.

[6] Stewart testified this camera is "either activated when we turn on our overhead lights, or when we manually activate it using our body mic, or pressing [sic] the button before we exit the vehicle." (V R.R. at 20). It is not clear which method Stewart used; in any event, the camera "actually records 30 seconds" before it is activated. (V R.R. at 20).

13

promptly, without incident, to Stewart's instruction (or instructions)[7] to return to his vehicle, (V R.R. at 27) ("Q: But yet you told him to go back to the vehicle. Correct."), at which point the officers shine their flashlights at Appellant and the vehicle as Stewart begins questioning him. (State's Ex. 3; 00:31—00:52). During the initial part of this investigation, Stewart's fellow officer is nearby, shining her flashlight into the vehicle, and both are close to Appellant. (State's Ex. 3; 00:50—1:08). According to Stewart, Appellant told him "he was waiting on somebody to pick him up and that they had passed." (V R.R. at 22). Stewart replied that "whenever we initially passed the vehicle, we didn't observe anybody, nor was there anybody in front of us at that time." (V R.R. at 22). However, a vehicle traveling in the opposite direction clearly passes the patrol car in the video. (State's Ex. 3; 00:00—00:06). Stewart also told Appellant the high beams were "being flashed as we passed", and Appellant "apologized to me for that." (V R.R.

---

[7] In the video, Appellant, while on the phone, turns around quickly and moves in the direction of the vehicle, stops (with the phone at his mid-section) and faces the officers while pointing in another direction, and then again moves with a quick turn (as if in response to a command) towards the vehicle, supporting the inference that Stewart issued more than one instruction to Appellant to return to the vehicle. (State's Ex. 3; 00:31—00:40). However, the dashboard camera shakes twice, as if to indicate the doors being slammed, after Appellant initially turned around quickly. (State's Ex. 3; 00:35-00:36). This, coupled with Stewart's testimony that he "advised" Appellant "to go back to the vehicle that he exited", could indicate but one verbal command or instruction. Stewart's later affirmation that he "told" Appellant to return to the vehicle suggests one instruction only. (V R.R. at 27) ("Q: But yet you told him to go back to the vehicle. Correct."). The State's opening, for what it is worth, *see Brennan*, 334 S.W.3d at 74 (statements by counsel made during opening statements are not evidence), places one command only on Stewart's lips: "You need to get back to the car". (V R.R. at 10). As does Appellant's closing: "You, back to the car." (V R.R. at 45).

14

at 22). Appellant denied having any weapons or anything illegal on him. (V R.R. at 22).

The video depicts Appellant and Stewart conversing until they move in unison (at Officer Stewart's instruction—"I moved him to the front of the vehicle" (V R.R. at 16)) towards the front of the vehicle where they continue their conversation for some time. (State's Ex. 3; 00:52—2:25). As they do so, the other officer circles the back of the vehicle and questions the driver. (State's Ex. 3; 00:52—2:25). The area itself is well-lit. (State's Ex. 3).

According to Stewart, Appellant "appeared very nervous, animated, raising his hands when he spoke. He wouldn't really stay in one spot." (V R.R. at 16). However, the video shows Appellant remaining in the only two spots to which Stewart told him to go. (State's Ex. 3; 00:47—2:25). Stewart conceded he "did not know what was going on at that time", but Appellant's "demeanor and his behavior" made him suspect a robbery or an assault had occurred. (V R.R. at 18; 27). Thus, well after the other officer-trainee began talking to the driver (who would have been the victim of the robbery or assault) (State's Ex. 3; 1:20) (officer arrives at driver's side door), and well after talking to Appellant at length (State's Ex. 3; 00:49) (approximately the beginning of the interaction), for his safety and that of his trainee, Stewart "asked [Appellant] if he had any weapons or anything illegal on him and he said no", so Stewart "asked if [he] could pat [Appellant]

15

down", and Appellant "advised" Stewart that he could. (V R.R. at 16; 18) (State's Ex. 3; 2:26) (beginning of pat down).

Stewart uncovered a "prescription pill bottle without a label" during this search, and he obtained Appellant's permission to remove and open the bottle.[8] (V R.R. at 16-17) (State's Ex. 3; 2:26—3:17) (showing entire pat down). Following that, Stewart attempted to place Appellant under arrest. (State's Ex. 3; 3:18—3:23). Appellant moved his left arm, though not violently, out of Stewart's grasp and appeared to say something to him before Stewart, for reasons that are not clear, slammed Appellant on the hood of the car. (State's Ex. 3; 3:18—3:24). There followed a bit of a scuffle during which Appellant was thrown to the ground, kneed by Stewart, and ultimately fled with Stewart in hot pursuit. (State's Ex. 3; 3:25—3:50). Appellant escaped that night, and was later indicted for evading arrest or detention with a prior conviction. (V R.R. at 23-24) (I C.R. at 4-5).

## 2. Trial

During voir dire, Appellant's counsel spent much time questioning the jury about a lawful versus an unlawful arrest, and what verdict should be returned if the arrest is unlawful. (IV R.R. at 55-62). The venire had great difficulty understanding or accepting that a person can run from a police officer and still not commit the offense: "Who agrees with 12 and 32 that basically you should stop no

---

[8] The pills apparently turned out to be acetaminophen hydrocodone. (V R.R. at 19).

matter what, and that there is no issue as to whether or not it's a lawful detention or not?...No. 1, No. 5, No. 7…9, 14, 18, 21, 23, 24, 28, 33, 34, 36, and 17, 35, 50, 46, 42, 41, 40, and 37."  Of these, Number 7 (Pamela Coone), Number 17 (Brandi Rountree), Number 21 (Kelli Gindrup), Number 28 (Robert Ferguson), and Number 37 (Terry Floyd) ended up on Appellant's jury.  (V R.R. at 76) (Floyd is the alternate) (I C.R. at 29-30).

During opening statements, Appellant's trial attorney told the jury "[w]e do not believe there was any probable cause whatsoever to even make contact with them that night", and expressed his "hope" that the jury would therefore return a verdict of not guilty:  he was "confident that you will see that there was no reason to come in contact with [Appellant]."  (V R.R. at 12).  After the State rested, Appellant moved for a directed verdict, arguing that the "State never established a reason for the stop."  (V R.R. at 39).  He added that "[t]here was no probable cause to stop the vehicle", and "plus they never established any smidgen of evidence that would show that they had a reason to make contact with Mr. Salinas that night."  (V R.R. at 39).

Appellant requested an instruction in the jury charge that would have informed the jury that "our laws permits [sic] the stop, arrest, detention, and search of a person by a peace officer without a warrant only when probable cause exist [sic] to believe the individual has committed or is committing an offense."  (I C.R.

17

at 35). The requested instruction also would have apprised the jury that "probable cause", among other things, would "warrant a man of reasonable caution to believe that an offense has been or is being committed." (I C.R. at 35). This instruction was bench-filed on the day of trial at 9:22 am, (I C.R. at 35), before the formal charge conference (V R.R. at 40) (noting break taken from 9:19 a.m. to 9:53 a.m., then recording "Conference on Jury Instructions"), and before the jury charge was read to the jury. (V R.R. at 40-41) (return to open court at 9:57 a.m. after the formal charge conference, and then charge read to the jury). However, the judge refused Appellant's requested instruction, and instead, charged the jury that "our laws permit the stop, detention, and limited search of a person by a peace officer without a warrant when the police officer has an articulable suspicion". (I C.R. at 39). The charge also told the jury that "if you have a reasonable doubt that the peace officer unlawfully obtained the evidence, you may not consider such evidence for any purpose whatsoever and you will return a verdict of not guilty." (I C.R. at 39). However, the instruction failed to state that the officer must suspect that criminal activity has occurred, is occurring, or will occur, and did not state that the suspicion must be reasonable. (I C.R. at 39). Before giving the charge, the judge asked during the formal charge conference, "Are there any objections to the charge?" (V R.R. at 40). Appellant's attorney parroted the State by saying, "Not from the Defense, Your Honor." (V R.R. at 40).

18

During closing, Appellant's attorney argued that there was "no reason whatsoever for the officer to make contact with him except for – oh, he –the officer said, well, he could have robbed him, he could have done this." (V R.R. at 45). His attorney added, "I'm going to dispute 'lawful', because I don't believe he had a reason…to stop him. There's no articulable suspicion about this. It says a vehicle pulled on the side of the road. If that's the case, every vehicle pulled on the side of the road is suspicious and we have the cops stopping everybody." (V R.R. at 46). He further argued the Appellant was forced to comply with the officer's demands, that this was not a consensual encounter, and that "articulable suspicion" was too broad of a term. (V R.R. at 46-47) ("'Articulable suspicion,' that could be anything. That's just too general of a term. That can be anything the officer—well, you know, well, through my training and experience I've known bank robbers to drive cars at night so I think I'll stop that vehicle. I know burglaries that take place in a car wash, so I think I'm going to stop the vehicle washing the car."). He argued, "I don't believe you're going to see headlights flashing at all", (V R.R. at 44), and gave his view of this evidence: "What I see in the video is the officer is way down the road. If this was such a big concern, this guy flashing the lights, let me turn around right on the spot." (V R.R. at 44). Finally, he directed the jury to the essential point upon which the case hinged: "it all comes down to did the officer have reason to stop that vehicle or even come in

19

there." (V R.R. at 48). The State argued that the facts would make one suspicious, but did not argue that the facts suggested anything criminal. (V R.R. at 49-50) ("All they did is they saw a car two weeks or more or less before Christmas, across from the soccer field, with the lights at a car wash on a cool night, just before midnight…What are they doing there? That would be your first thing. But then as you drive by, as a police car, someone's flashing lights…As I'm driving by in a police car and I think that car is not really in a place where it ought to be, that raises some suspicion. It's doing something really unusual. Maybe I ought to turn around and go see what's going on.").

The jury sent a note asking to the view the video again. (I C.R. at 43). Nevertheless, after an hour and eleven minutes of deliberation, the jury convicted Appellant of evading arrest or detention with a prior conviction for the same, and, because of enhancements to which Appellant pled true, assessed punishment at five years' imprisonment and a $2,500 fine. (V R.R. at 53-54; 60-61; 105) (I C.R. at 44; 51). The judge imposed the sentence. (V R.R. at 106) (I C.R. at 53-54).

## SUMMARY OF THE ARGUMENT

ISSUE ONE: Because the investigative detention of Appellant was unlawful, the subsequent attempted arrest was also unlawful, and therefore the evidence is insufficient to support Appellant's conviction.

20

Based on the totality of the circumstances, Appellant was detained when Stewart told Appellant to return to his vehicle and Appellant complied. In the alternative, Appellant was detained when Stewart moved him to the front of the vehicle and Appellant complied. Neither detention was justified by reasonable suspicion, so under *Rodriguez*, the ensuing attempted arrest or detention was unlawful. Therefore, the evidence is legally insufficient to support Appellant's conviction.

## ARGUMENT

## Standard of Review

In evaluating legal sufficiency, the appellate court reviews all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). The reviewing court examines legal sufficiency under the direction of *Brooks*, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim.

App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

Because an arrest following an illegal investigative or temporary detention would be "tainted, and therefore unlawful", making the evidence "insufficient to prove the lawful arrest element of the evading arrest conviction", *Rodriguez v. State*, 578 S.W.2d 419, 420 (Tex. Crim. App. 1979), this case first turns on whether and when Stewart conducted an investigative detention of Appellant (rather than engaged in a merely consensual encounter), and, if so, whether that investigative detention was justified by reasonable suspicion based on specific, articulable facts that, when combined with rational inferences from those facts, would lead Stewart reasonably to conclude that the Appellant was, had been, or soon would be engaged in criminal activity. *Wade v. State*, 422 S.W.3d 661, 667-668 (Tex. Crim. App. 2013). "The question of whether the particular facts show that a consensual encounter has evolved into a detention is a legal issue that is reviewed *de novo*." *Id.* at 668. Likewise, "the question of whether a certain set of historical facts gives rise to reasonable suspicion is reviewed *de novo*." *Id.* at 669.

**Law**

### 1. The offense itself

A person commits the offense of evading arrest or detention "if he intentionally flees from a person he knows is a peace officer or federal special

investigator attempting lawfully to arrest or detain him." Tex. Pen. Code §

38.04(a). If a person has "been previously convicted under this section", the

offense is a state jail felony. Tex. Pen. Code § 38.04(b)(1)(A). The offense may

be punished, because of enhancements, as a third-degree felony. Tex. Pen. Code §

12/425(a).

**2. If the investigative or temporary detention preceding the attempted arrest is unlawful, the subsequent attempted arrest is unlawful, and the evidence is insufficient to support the conviction**

Where, however, "there are not sufficient grounds for [a] temporary

detention, the subsequent arrest would be tainted and therefore unlawful."

*Rodriguez v. State*, 578 S.W.2d 419, 420 (Tex. Crim. App. 1979). Hence, should

the reviewing court determine that a temporary detention is unlawful, the court

"can stop [its] examination of the facts at [that] point": "[a]ny subsequent arrest

arising out of the unlawful detention would likewise be unlawful, and therefore the

evidence is insufficient to prove the lawful arrest element of the evading arrest

conviction." *Id*. at 419-420.

The first question, then, is whether Stewart conducted a temporary detention

(or investigative detention, as it will be called hereafter)[9] of Appellant. If so, the

---

[9] While *Rodriguez* uses the phrase "temporary detention" rather than "investigative detention", the Court is plainly using the former as a substitute for the latter. *Rodriguez*, 578 S.W.2d at 420 ("Likewise in this case, there was no lawful basis for the *investigative* action.") (emphasis added). A defendant, moreover, "may not be detained even momentarily without reasonable, objective grounds for doing so", *Florida v. Royer*, 460 U.S. 491, 498, 103 S. Ct. 1319, 1324, 75 L. Ed. 2d 229 (1983), and any "an investigative detention must be temporary". *Id*. at 500, 1325.

second question is whether that investigative detention was based on reasonable suspicion. To answer these questions, we must first distinguish among the types of interactions between the police and a citizen, then explain the test for deciding which type of interaction is occurring at any given time during the course of the police-citizen interaction, and finally, explain the test for determining whether reasonable suspicion exists to perform an investigative detention. Following that, we will apply the law to the facts.

### 3. Three levels of police-citizen interactions

In *Wade v. State*, 422 S.W.3d 661, 667 (Tex. Crim. App. 2013), the Court of Criminal Appeals delineated the three types of police-citizen interactions:

(1) Consensual encounters that do not implicate the Fourth Amendment;

(2) Investigative detentions that are Fourth Amendment seizures of limited scope and duration that must be supported by a reasonable suspicion of criminal activity; and

(3) Arrests, the most intrusive of Fourth Amendment seizures, that are reasonable only if supported by probable cause.

*Id.* at 667-668.

---

Hence, "temporary detention" and "investigative detention" are synonymous. In any event, a detention (whatever adjective is added to it), being a seizure, implicates the Fourth Amendment. *State v. Woodard*, 341 S.W.3d 404, 411 (Tex. Crim. App. 2011) ("This is the point at which an encounter becomes a detention or arrest, both of which are seizures under the Fourth Amendment.").

Because "[p]olice officers are as free as any other citizen to approach citizens[10] to ask for information or cooperation", *Wade*, 422 S.W.3d at 667, the critical question will be whether and when the interaction between Appellant and the officers became a detention rather than a consensual encounter.

### 4. Distinguishing consensual encounters from investigative detentions

Where the defendant is not in a confined location in which his movement is restricted due to circumstances beyond his control, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' *Florida v. Bostick*, 501 U.S. 429, 437, 111 S. Ct. 2382, 2387, 115 L. Ed. 2d 389 (1991) (citing *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S. Ct. 1975, 1977, 100 L. Ed. 2d 565 (1988)). In other words, would a reasonable person feel free to leave? *Bostick*, 501 U.S. at 437.[11]

This "'reasonable person' test presupposes an *innocent* person." *Bostick*, 501 U.S. at 438, 111 S. Ct. at 2388 (emphasis in original). The "test is both

---

[10] In language that smacks of hyperbole, the Court of Criminal Appeals has stated: "Police officers may be as aggressive as the pushy Fuller-brush man at the front door, the insistent panhandler on the street, or the grimacing street-corner car-window squeegee man. All of these social interactions may involve embarrassment and inconvenience, but they do not involve official coercion." *State v. Garcia-Cantu*, 253 S.W.3d 236, 243 (Tex. Crim. App. 2008).

[11] Should the defendant find himself in a confined location, such as a bus, at the time the officers approach him, the test is altered slightly: "[i]n such a situation, the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 437.

objective and fact specific", *State v. Garcia-Cantu*, 253 S.W.3d 236, 243 (Tex. Crim. App. 2008), and "[i]t is only when an officer, 'by means of physical force or show of authority, has in some way restrained the liberty of a citizen'" that a "seizure", and thus an investigative detention, has occurred. *Id.* at 242 (citing *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). "The surrounding circumstances, including time and place, are taken into account, but the officer's conduct is the most important factor when deciding whether an interaction was consensual or a Fourth Amendment seizure." *State v. Woodard*, 341 S.W.3d 404, 411 (Tex. Crim. App. 2011). "It is the display of official authority and the implication that this authority cannot be ignored, avoided, or terminated, that results in a Fourth Amendment seizure. At bottom, the issue is whether the surroundings and the words or actions of the officer and his associates communicate the message of 'We Who Must Be Obeyed.'" *Garcia-Cantu*, 253 S.W.3d at 243.

In short, a detention requires a "show of authority" on the part of the police, and submission to that show of authority on the part of the defendant. *California v. Hodari D.*, 499 U.S. 621, 626, 111 S. Ct. 1547, 1550, 113 L. Ed. 2d 690 (1991).

## 5. The test for reasonable suspicion

In *Wade*, the Court of Criminal Appeals summarized the reasonable suspicion test as follows:

"Reasonable suspicion of criminal activity permits a temporary seizure for questioning that is limited to the reason for the seizure. A police officer has reasonable suspicion for a detention if he has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that the person detained is, has been, or soon will be engaged in criminal activity. This is an objective standard that disregards the actual subjective intent of the arresting officer and looks, instead, to whether there was an objectively justifiable basis for the detention."

*Wade*, 422 S.W.3d at 668 (citations omitted).

As with the test for investigative detentions, the test here is based on the "totality of the circumstances": "individual circumstances may seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified." *Id*. (citation omitted).

However, "the facts invoked to justify an investigative detention must support more than a mere hunch or good-faith intuition that criminal activity is afoot." *Derichsweiler v. State*, 348 S.W.3d 906, 916 (Tex. Crim. App. 2011). Rather, we require particularity: the "officer, of course, must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1 (1989) (quotation and citation omitted). "It is enough to satisfy the lesser standard of reasonable suspicion that the information is sufficiently detailed and reliable—i.e., it supports more than an inarticulate hunch or intuition—to suggest that

27

*something* of an apparently criminal nature is brewing." *Derichsweiler*, 348 S.W.3d at 917 (emphasis in original).

**Application**

**A. Detention**

Appellant was detained when Stewart told Appellant to return to his vehicle and Appellant complied. In the alternative, Appellant was detained when Stewart moved him to the front of the vehicle and Appellant complied.

**1. Stewart and his fellow officer detained Appellant**

This Court first asks whether the officers displayed their authority and whether Appellant submitted to it. *Garcia-Cantu*, 253 S.W.3d at 243.

**a. Initial displays of authority**

The following displays of authority are present before Stewart moved Appellant to the front of the vehicle:

(1) Stewart directed Appellant to return to the vehicle. (State's Ex. 3; 00:32—00:48) (V R.R. at 16) (Stewart "advised" Appellant to go back to the vehicle) (V R.R. at 27) (Stewart agrees he "told" Appellant to return to the vehicle); *cf.* (V R.R. at 10) (State informs the jury Stewart told Appellant: "You need to get back to the car") and (V R.R. at 45) (Appellant's attorney "quotes" Stewart as saying "You, back to the car.")

(2) Stewart and his fellow officer parked their patrol vehicle near Appellant and the vehicle. (State's Ex. 3; 00:30).

(3) Stewart and his fellow officer were in full uniform with weapons visible. (V R.R. at 24-25).

(4) Around midnight, Stewart and his fellow officer approached Appellant (who was alone, except for his companion who was in the vehicle) with flashlights shining although the area was well-lit. (State's Ex. 3; 00:40—00:54).

(5) Stewart questioned Appellant while in close proximity to him, and Stewart's fellow officer was nearby, shining her light into the parked vehicle. (State's Ex. 3; 00:48—1:08).

Each of these factors, combined, shows a sufficient display of authority.

*United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877, 64 L. Ed. 2d 497 (1980) (test considers "all of the circumstances", and "[e]xamples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled").

Stewart, by his own admission, told Appellant to return to the vehicle, which in itself has the force of an order. (V R.R. at 27); *White v. State*, 852 S.W.2d 53, 56 (Tex. App.—Texarkana 1993, no pet.) ("we find that the detention in the present case began when Officer Shutte asked or told White to stop"); *Ebarb v. State*, 598 S.W.2d 842, 850 (Tex. Crim. App. 1979) ("when a person is sitting in a parked car and a police officer orders him to roll down the window or to open the door, there is at that point a temporary seizure for investigative detention"). The force of this order is also clear from Appellant's reaction, which was a submission to authority: Appellant immediately began returning to the vehicle after the officers emerged from the patrol car, and when he turned around and pointed in another direction, he again returned to the vehicle as the officers approached. (State's Ex. 3; 00:32—00:41); *see Hernandez v. State*, 376 S.W.3d 863, 871 (Tex. App.—Fort Worth 2012, no pet.) ("The second element is met in this case because the record shows that Appellant yielded: Wickham testified that Appellant abruptly returned his car to its parking space when Wickham shined the spotlight on the window").

Add to this the facts that two officers approached Appellant and his companion (who were alone) around midnight with flashlights (unnecessary because the area was well-lit) while in full-uniform and with weapons visible, and the circumstances further suggest a reasonable person would not have felt free to

ignore the officers or continue on his way. *Lewis v. State*, 15 S.W.3d 250, 254 (Tex. App.—Texarkana 2000, no pet.) ("All officers on the scene had weapons that were visible to Lewis throughout this encounter."); *Brown v. State*, 790 S.W.2d 357, 359-360 (Tex. App.—Houston [14th Dist.] 1990, pet. ref'd) (reasonable person would not have felt free to leave or disobey officer's request where two uniformed and "presumably" armed officers approached defendant in a "dark and fairly deserted area and told her to stand"; area was an apartment complex staircase); *Garcia-Cantu*, 253 S.W.3d 236, 245, 247-248 (among factors that supported finding that interaction was a detention was the lateness of the hour (4 a.m.) and use of a "large flashlight in both hands at shoulder-level").[12] Stewart's partner's use of her flashlight to shine into the interior of the vehicle further suggests a detention. *Garcia-Cantu*, 253 S.W.3d at 248 (officer "played his flashlight across the female passenger's side of the truck to track the passenger's exit from the truck"). Moreover, the officers engaged Appellant at close quarters, having just parked their patrol vehicle near him, and Stewart activated his dashboard camera. *Garcia-Cantu*, 253 S.W.3d at 245 (among the factors supporting the conclusion that a detention occurred was the fact that the officer activated his dashboard camera to record the encounter).

---

[12] While the Court of Criminal Appeals acknowledged that the "lateness of the hour may be subject to various different inferences", the Court concluded: "[i]t is a reasonable inference that the objectively reasonable person would feel freer to terminate or ignore a police encounter in the middle of the day in a public place where other people are nearby than he would when parked on a deserted, dead-end street at 4:00 a.m."). *Garcia-Cantu*, 253 S.W.3d at 245, n. 42.

"A court must step into the shoes of the defendant and determine from a common, objective perspective whether the defendant would have felt free to leave." *Id*. at 244 (quoting *United States v. Steele*, 782 F.Supp. 1301, 1309 (S.D. Ind. 1992)). Perhaps, then, in the end the best test would be for the panel to watch the video while imagining itself in Appellant's place: applying common sense and viewing the facts objectively, would a panel member, late at night, feel free to hop into the vehicle and drive off after a patrol car stops, an officer orders the panel member back to the vehicle, and then, along with his cohort, approaches in full uniform with guns visible and flashlights poised for a search? If Appellant had returned to *and entered* the vehicle, and then drove off with his companion, we may suspect State's Exhibit 3 would be a bit longer and a bit more spellbinding.

### b. Submission to the initial show of authority

Appellant submitted to these initial shows of authority when he returned to the vehicle as he was told to do. (State's Ex. 3; 00:32—00:48); *Hernandez*, 376 S.W.3d at 871 (returning vehicle "abruptly" to parked space after officer shone spotlight on the window enough to satisfy "submission" element). In fact, compliance with a request to exit a vehicle is enough to show detention. *Wade*, 422 S.W.3d at 666, 670 ("I asked him to step out of the vehicle" (at 666); "As ordered, appellant got out of his truck" (at 666); "appellant was not 'seized' until

he complied with Warden Campbell's order to get out of his truck for a frisk" (at 670)). Much more so, then, did Appellant submit when he returned to the vehicle.

### c. Detention once Stewart moved Appellant to the front of the vehicle

Should the Court disagree that the interaction was a detention from the outset, certainly the encounter morphed into a detention when Stewart "moved" (in his words) Appellant to the front of the vehicle. (State's Ex. 3; 01:08—1:14). Again, applying common sense and stepping into Appellant's shoes, *Garcia-Cantu*, 253 S.W.3d at 244, would a reasonable person have felt free to reenter his vehicle and order the driver to take off, as one officer circled the vehicle to investigate the driver, after Stewart instructed Appellant to move to the front of the vehicle for further interrogation? Clearly, once Stewart "moved" Appellant to the front of the vehicle and Appellant complied, a detention began, if one had not begun already.

## B. Reasonable Suspicion

### 1. No reasonable suspicion justified the detention

Because Appellant was detained, that detention must be supported by reasonable suspicion or else it is unlawful. "A police officer has reasonable suspicion for a detention if he has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that the person detained is, has been, or soon will be engaged in criminal activity." *Wade*, 422 S.W.3d at 668.

Because there are two possible points at which Appellant was detained, it will be helpful to distinguish between the facts known to Stewart at the time he stopped his patrol car and the time he moved Appellant to the front of the vehicle. *State v. Ruelas*, 327 S.W.3d 321, 326 (Tex. App.—El Paso 2010, pet. ref'd) ("We look at only those facts known to the officer at the inception of the stop."). Then, we can determine whether those facts justified the detention, whenever the Court deems it began.

### a. Lack of reasonable suspicion based on facts known upon the initial stop

At the time Stewart pulled into the car wash parking lot and told Appellant to return to his vehicle, he knew these facts:

1. It was nearly midnight in December. (V R.R. at 15; 22)

2. There was a car parked alone in a car wash parking lot, and Stewart "hadn't seen anybody at that car wash that late at night in a long period of time", which was the eighteen months he was on the night shift.[13] (V R.R. at 16; 18; 29).

3. The car may have flashed its high beams as Stewart initially passed and "as we approached the parking lot". (V R.R. at 16; 18).

At the outset, Stewart's testimony that the high beams flashed "as we

---

[13] Stewart testified that he "believe[d] it was fairly cool", but admitted on re-cross that he was just guessing based on the videotape. (V R.R. at 30-31). Appellant is wearing a jacket in the video. (State's Ex. 3).

approached the parking lot" is flatly contradicted by the video: it did not happen.[14] (V R.R. at 16) (State's Ex. 3; 00:00—00:30). A jury is entitled to believe Stewart's testimony over the video, but such a choice would not be rational. *Brooks v. State*, 323 S.W.3d 893, 907 (Tex. Crim. App. 2010) ("The store clerk at trial identifies A as the robber. A properly authenticated surveillance videotape of the event clearly shows that B committed the robbery. But, the jury convicts A. It was within the jury's prerogative to believe the convenience store clerk and disregard the video. But based on *all* the evidence the jury's finding of guilt is not a rational finding.") (emphasis in original) (quoting *Johnson v. State*, 23 S.W.3d 1, 15 (Tex. Crim. App. 2000) (McCormick, P.J., dissenting). If we nevertheless credit Stewart's testimony that the high beams flashed when he initially passed the vehicle, this, combined with the time of night, the time of year, and the location of the vehicle still do not amount to reasonable suspicion.

In *Hernandez v. State*, "sometime after 2:00 a.m., when no businesses were open, [the officer] observed a black BMW parked in an empty ["strip mall"] parking lot with its headlights and left turn signal illuminated and driver's side door open". *Hernandez v. State*, 376 S.W.3d 863, 866 and 870 (Tex. App.—Fort Worth 2012, no pet.). The officer "pulled into the lot due to the time of night, the

---

[14] The video does not show the car that is traveling in the opposite direction of the patrol car pass Appellant's vehicle. (State's Ex. 3; 00:00—00:06). If the headlights were flashed at this vehicle shown as it passed Appellant's video, the video would fail to capture it. However, in that event the headlights would not have been "still being flashed" as Stewart "approached the parking lot". (V R.R. at 16).

location of the BMW, the headlights and left turn signal on and the door open, and the 'potential for burglaries in that area.'" *Id.* The Fort Worth Court had no trouble concluding that the record "does not support a conclusion that reasonable suspicion justified Appellant's detention." *Id.* The Court noted that "apart from [the officer's] guessing what, if anything, Appellant might have been up to, he did not articulate any specific facts that when combined with their rational inferences would have lead him to reasonably conclude that Appellant was, had been, or was about to engage in criminal activity." *Id.* The officer's "curiosity or 'wondering about maybe a possible break-in' amount[ed] to nothing more than an inchoate and general suspicion or hunch." *Id.*

Appellant's case is similar to but even stronger than *Hernandez*. Appellant's vehicle was also parked alone at night, though earlier in the night (V R.R. at 2) ("around 11:40 pm") (State's Ex. 3) than the vehicle in *Hernandez* (sometime after 2 a.m., when the bars generally close), making the time of night less suspicious. The vehicle in *Hernandez* displayed odder behavior than what as alleged in Appellant's case: surely leaving a door open and a turn signal flashing on a vehicle parked in an empty strip mall parking lot is, at the very least, curious behavior. As for the flashing headlights, Stewart admitted there was no traffic violation, (V R.R. at 27), and he did not testify that he stopped out of concern for anyone's safety. *Hernandez*, 376 S.W.3d at 874 (discussing "community

36

caretaking function" exception to the Fourth Amendment's requirements, but noting that a "police officer may not properly invoke his community caretaking function if he is primarily motivated by a non-community caretaking purpose."). Nor did he testify that flashing headlights is a signal that signals crime, such as a carjacking. Plus, there was clearly a vehicle coming in the opposite direction of the patrol car as the patrol car approached the car wash, and the headlights could have been flashed (if indeed they were flashed) at that vehicle. (State's Ex. 3; 00:00—00:06). But, most significantly, Stewart articulated no facts to support a belief that, *when he stopped to investigate*, "*something* of an apparently criminal nature [was] brewing." *Derichsweiler v. State*, 348 S.W.3d 906, 917 (Tex. Crim. App. 2011) (emphasis in the original). His testimony that he "did not know what was going on", but that he "felt that there was possibly either an assault that was taking place, that he had robbed the driver, he was trying to get away" was "based on [Appellant's] demeanor and his behavior"—"demeanor and behavior" that he did not and could not observe until after he detained Appellant. (V R.R. at 16 (Stewart testified he observed Appellant exit the vehicle as Stewart entered the parking lot); 18) (State's Ex. 3; 00:00—00:32) (Appellant already out of vehicle as the officers approach). Stewart put it well himself: all he knew when he pulled into the parking lot was that "[i]t was suspicious to [him] at the time of night, it was December, they were at a car wash and then when we passed, they flickered

37

their headlights at us or high beams as if to signal us." (V R.R. at 18). But "suspicious" of *what crime*? While he need not be able to cite the particular penal statute he thinks has been, is being, or is soon to be flouted, *Derichsweiler*, 348 S.W.3d at 916-917, he still must be able to point to specific, articulable facts that "the person detained is, has been, or soon will be engaged in *criminal* activity." *Wade v. State*, 422 S.W.3d 661, 668 (Tex. Crim. App. 2013) (emphasis added). Stewart testified to no crime that he thought Appellant had committed when he pulled into the parking lot, and he testified to no facts supporting the reasonable inference that crime was afoot. Again, his suspicion that perhaps an assault or a robbery was going on did not materialize until after he detained Appellant, and even then he "did not know what was going on." (V R.R. at 18). Even the officer in *Hernandez* was able to do more: he could at least suspect that there was a "potential for burglaries" in a "generally poorly lit" area where "[n]o lights were on at any of the businesses in the parking lot'". *Hernandez*, 376 S.W.3d at 866, 870. And while Stewart testified that it was his "experience that [suspects] can use [being animated on a cell phone] as a decoy to throw us off track", he also admitted he "could not see if [Appellant] was on the phone." (V R.R. at 27).[15]

---

[15] Stewart affirmed he knew Appellant and recognized him right away. (V R.R. at 24; 28). But the record does not enlighten us as to how Stewart knew Appellant: were they accustomed to lunch together, to take in a movie, or to worship together, or was Appellant a notorious criminal? Even if the most likely inference is this last one, nothing shows that this is in fact why Stewart recognized him, nor does anything suggest that, whatever Appellant's criminal history as known to Stewart may have been, there was a connection between Appellant's criminal history and the

At bottom, then, Stewart lacked specific, articulable facts that would support a rational inference of criminal activity by Appellant. Perhaps by characterizing the situation as "suspicious" based on time of night (around 11:40 pm), time of year (December), the location (a car wash), and the (allegedly) flashing headlights, (V R.R. at 18), Stewart meant the situation was odd—after all, he himself testified he "hadn't seen anybody at that car wash that late at night in a long period of time." (V R.R. at 29). Still, "[t]he behavior upon which [he] here relied may have seemed odd to [him]. But that is not the issue." *Crockett v. State*, 803 S.W.2d 308, 313 (Tex. Crim. App. 1991). "What matters are the objective facts that indicate criminal activity, not the officer's characterization of them."[16] *Wade v. State*, 422 S.W.3d 661, 671 (Tex. Crim. App. 2013).

Nothing about the facts delineated above, alone or combined, suggest criminal activity. The record also fails to contain other facts that might support reasonable suspicion. There was no tip that Appellant was engaged in criminal

near presence of crime. For example, had Stewart testified, "I saw Appellant, a known narcotics user, loitering, at a late hour, in a place known for narcotics transactions", this might suffice to show reasonable suspicion. *See Haymond v. State*, 01-92-01233-CR, 1993 WL 270525, at *2 (Tex. App.—Houston [1st Dist.] July 22, 1993, no pet.) (not designated for publication) ("At least four specific and articulable facts created a reasonable suspicion that justified the investigative stop: 1) it was 4:20 in the morning; 2) appellant was loitering with a group of people, one of whom was a known prostitute; 3) the loiterers were at the back of the truckstop, where the truckstop owners had reported previous narcotics dealings; and 4) upon seeing the officer's patrol car, the crowd quickly dispersed."). Or, "I saw Appellant, a known car wash vandalizer…."

[16] Similarly, "[a]n officer's stated reason for the stop is not controlling if there is an objectively reasonable basis for the stop as shown by the evidence." *State v. Ruelas*, 327 S.W.3d 321, 326 (Tex. App.—El Paso 2010, pet. ref'd). As shown in this brief, there was no objective basis to conclude Appellant had been, was, or would be engaged in criminal activity.

activity. *Hawkins v. State*, 758 S.W.2d 255, 260 (Tex. Crim. App. 1988) ("there was no testimony that either police officer had received information that appellant was engaged in criminal activity."). No testimony showed the car wash was located in a "high crime area", and even if it were, such a fact would merely be relevant, not sufficient. *Cook v. State*, 1 S.W.3d 722, 725 (Tex. App.—El Paso 1999, no pet.) ("high-crime or drug dealing reputation of the area cannot alone serve as a basis for an investigative stop"); *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 676, 145 L. Ed. 2d 570 (2000) (while an area's reputation as a "high crime area" is "among the relevant contextual considerations in a *Terry* analysis", it is not enough by itself to show reasonable suspicion). Appellant did not even run at the approach of the officers—a fact which, even if present, would not by itself have been enough in any event. *McKinney v. State*, 444 S.W.3d 128, 134 (Tex. App.—San Antonio 2014) ("A person running at the sight of a patrol vehicle in high crime area, in and of itself, does not give an officer reasonable suspicion to conduct an investigatory detention."). The initial detention was not justified by reasonable suspicion.

### b. Lack of reasonable suspicion at the time Stewart moved Appellant to the front of the vehicle

When Stewart moved Appellant to the front of the vehicle, he knew the following additional facts:

1. Stewart recognized Appellant (but gave no further details). (V R.R. at 24; 28).

2. Appellant, in Stewart's estimation, "appeared very nervous, animated, raising his hands when he spoke." (V R.R. at 16).

3. Appellant "wouldn't really stay in one spot." (V R.R. at 16); *but see* (State's Ex. 3; 00:47—2:25) (Appellant moves only to the two spots to which Stewart told him to move).

4. Appellant stated "he was waiting on somebody to pick him up and that they had passed", but Stewart "informed him that whenever we initially passed the vehicle, we didn't observe anybody, nor was there anybody in front of us at that time." (V R.R. at 22). A vehicle had passed the patrol car as the patrol car approached the car wash. (State's Ex. 3; 00:00—00:06).

5. Appellant apologized to Stewart for the high beams being flashed. (V R.R. at 22).

6. "[B]ased on [Appellant's] demeanor and his behavior, [Stewart] felt that there was possibly either an assault that was taking place, that he had robbed the driver, he was trying to get away, did not know what was going on." (V R.R. at 18).

7. The driver of the vehicle, who would have been the victim of the suspected assault, robbery, or other unknown crime, remained in the vehicle and did not ask the officers for help. (State's Ex. 3).[17]

None of these, combined, justify Stewart detaining Appellant by moving him to the front of the vehicle, if that is when the Court believes Appellant was detained. As with the testimony regarding the flashing headlights discussed above, here at the outset we must note that Stewart's testimony that Appellant "wouldn't really stay in one spot" is also flatly contradicted by the video. (V R.R. at 16); (State's Ex. 3; 00:47—2:25). Instead, the video shows Appellant moving only to the two places to which Stewart told him to move: the side and the front of the vehicle. (State's Ex. 3; 00:47—2:25). Again, while a jury is free to believe Stewart over the video, such a choice is not rational on these facts. *Brooks v. State*, 323 S.W.3d 893, 907 (Tex. Crim. App. 2010) ("The store clerk at trial identifies A as the robber. A properly authenticated surveillance videotape of the event clearly shows that B committed the robbery. But, the jury convicts A. It was within the jury's prerogative to believe the convenience store clerk and disregard the video. But based on *all* the evidence the jury's finding of guilt is not a rational finding.")

---

[17] Even just before the weapons frisk began Appellant's companion still had not asked for help despite having talked to Stewart's cohort for over a full minute. (State's Ex. 3; and at 1:08—2:25).

42

(emphasis in original) (quoting *Johnson v. State*, 23 S.W.3d 1, 15 (Tex. Crim. App. 2000) (McCormick, P.J., dissenting). Thus, this part of Stewart's testimony must be disregarded. Turning to the rest of the facts, no reasonable suspicion justified detaining Appellant.

First, as to Appellant's nervousness and demeanor. The Court of Criminal Appeals teaches that nervousness, while not irrelevant, is "not particularly probative": "[n]ervousness is not sufficient to establish reasonable suspicion, but nervous or evasive behavior is a relevant factor in determining reasonable suspicion for a *Terry* stop and frisk. However, it is not particularly probative because most citizens with nothing to hide will nonetheless manifest an understandable nervousness in the presence of the officer. And the more accusatory the questions that an officer asks, the more nervous a citizen legitimately becomes." *Wade v. State*, 422 S.W.3d 661, 671 (Tex. Crim. App. 2013) (footnotes and quotation marks omitted). In *Wade*, the game warden observed that the defendant's "'voice was wavering' and 'his vein in his neck [was] beating.' As the warden continued to ask questions, appellant was 'acting quite nervous'". *Id*. at 670. This, along with the rest of the facts, was not enough to support reasonable suspicion. *Id*. at 676. Here, Stewart did not testify to facts showing Appellant's nervousness was anything approaching Wade's: no "wavering" voice and no beating neck vein. (V R.R. at 16; 18). And while it is

unclear if Stewart's questioning can fairly be called "accusatory", *Wade*, 422 S.W.3d at 671, he did at least implicitly inform Appellant that he thought Appellant was lying: he pointed out that there was no one in front of the patrol car when they initially passed, and that the officers did not observe anyone. (V R.R. at 22). Thus, there was reason for Appellant to become legitimately more nervous. *Wade*, 422 S.W.3d at 671. Appellant's nervousness affords little or no basis to detain Appellant on these facts.

Second, though Stewart admitted he "did not know what was going on", (V R.R. at 18), Appellant's nervousness and demeanor[18]—insufficient to provide reasonable suspicion that crime is afoot—led him to suspect that "possibly either an assault…was taking place, that [Appellant] had robbed the driver, [Appellant] was trying to get away". (V R.R. at 18). But the driver did not exhibit signs of distress, nor indicate a need for help, nor otherwise attempt to communicate with the officers. (State's Ex. 3). It is common sense that a crime victim, not otherwise constrained, would naturally reach out, at the very least, to police officers who arrived "in the nick of time". Stewart had ample time to see that the alleged victim was not a victim at all, and certainly his partner, after talking to the driver for over a minute before Stewart searched Appellant, would have been satisfied that the

---

[18] Presumably the "raising his hands when [Appellant] spoke" that does not seem readily apparent from the video, unless moving them is synonymous with raising them. (V R.R. at 16) (State's Ex. 3).

44

driver was merely a driver, not a victim. (State's Ex. 3; 00:48—2:25). The fact that the driver did not hail the arrival of the police officers as a medieval damsel-in-distress would have hailed her knight in shining armor supports the conclusion that Stewart did not have reasonable suspicion to detain Appellant at the front of the vehicle. And in any event, Stewart, "of course, must be able to articulate something more than an inchoate and unparticularized suspicion or hunch" that crime is in the air. *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1 (1989) (quotation and citation omitted).

Third, as noted above in footnote 15, we may readily discount the fact that Stewart recognized Appellant. (V R.R. at 24; 28). Stewart did not indicate how he knew Appellant: he did not say whether this was because Appellant was a hardened criminal or a fellow Mason. Even if the most reasonable inference is that it is because Appellant was a criminal, there is nothing in the record to support the conclusion that this fact alone made Appellant likely to be engaging in further criminal activity of any nature. Had Stewart articulated facts that would show he had reason to believe that, because of Appellant's criminal background, a reasonable person would suspect Appellant had engaged, was engaging, or would engage in criminal activity, the case would stand differently. *See Haymond v. State,* 01-92-01233-CR, 1993 WL 270525, at *2 (Tex. App.—Houston [1st Dist.] July 22, 1993, no pet.) (not designated for publication). But as it is, whatever

reasonable inference Stewart might have been entitled to draw is unknown from this record.

Fourth, one might conclude that Appellant's answer that he was waiting on someone who had just passed would support a finding of reasonable suspicion, given that Stewart testified no one had passed by. However, a car clearly passes by in the video, (State's Ex. 3; 00:00—00:06), and in any event, Appellant's answer does not point to something criminal "brewing". *Derichsweiler v. State*, 348 S.W.3d 906, 917 (Tex. Crim. App. 2011). Rather, it shows that, as he said, he was waiting on someone to pick him up. Stewart did not state, for example, that flashing headlights is a common signal used in drug trafficking, or a typical distress signal sent by carjacking victims, or the like. And again, Stewart testified he suspected criminal activity only after he observed—and only based upon—Appellant's nervousness and his demeanor, not the flashing headlights. (V R.R. at 18).

Putting it all together, Stewart's suspicion of criminal activity should have dissipated rather than increased by the time he moved Appellant to the front of the vehicle: there was no distressed driver, only nervousness on the part of Appellant (insufficient of itself to provide reasonable suspicion), and, as noted above, no other facts that, when present, can support reasonable suspicion. And if Stewart moved Appellant to the front of the vehicle to perform a weapons frisk because he

46

feared for his safety and that of his fellow officer, (V R.R. at 16; 18), none of the non-exclusive factors generally justifying such frisks are present: we have no "1) no flight or no furtive gestures or sudden movements towards a pocket or other place where a weapon might be concealed; 2) no threats made and no attempt made to resist detention; 3) appellant [was] not shown to be committing or about to commit a criminal offense and; 4) appellant [did] not seem to be under the influence of alcoholic beverages or drugs." *Worthey v. State*, 805 S.W.2d 435, 438-439 (Tex. Crim. App. 1991) (citing *Lippert v. State*, 664 S.W.2d 712, 721 (Tex. Crim. App. 1984)). Therefore, even if the detention occurred when Stewart moved Appellant to the front of the vehicle, it is not supported by reasonable suspicion.

## C. Legal Insufficiency

Because "there [were] not sufficient grounds for [a] temporary detention, the subsequent arrest [was] tainted and therefore unlawful." *Rodriguez v. State*, 578 S.W.2d 419, 420 (Tex. Crim. App. 1979). Hence, this Court "can stop [its] examination of the facts at [that] point": "[a]ny subsequent arrest arising out of the unlawful detention would likewise be unlawful, and therefore the evidence is insufficient to prove the lawful arrest element of the evading arrest conviction." *Id*. at 419-420. This is precisely what we have here: an illegal detention (no matter when it occurred) followed by an attempted unlawful arrest that Appellant

47

evaded. As a result, the evidence is legally insufficient to support Appellant's conviction because the attempted arrest from which Appellant fled was unlawful. *Id*. at 420.

## Conclusion

Because Appellant was illegally detained, any subsequent attempted arrest was unlawful. Because Stewart attempted to arrest Appellant after Stewart had already illegally detained him, and because it is at that point only that Appellant evaded arrest, the evidence is legally insufficient to support Appellant's conviction, and he must be acquitted.

## SUMMARY OF THE ARGUMENT

ISSUE TWO: Appellant suffered sufficient harm because the Article 38.23 instruction misstates the law on what justifies an investigative detention by an officer.

The jury charge contained an Article 38.23 instruction that misstated the law by informing the jury that, in essence, an investigative detention is justified based on "articulable suspicion". This is erroneous in two respects: first, the law requires *reasonable*, not articulable, suspicion; second, that reasonable suspicion must be based on "specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that the person detained is, has been, or soon will be engaged in criminal activity." *Wade v. State*,

422 S.W.3d 661, 668 (Tex. Crim. App. 2013) (citations omitted). The Article 38.23 instruction in the charge did not say the "articulable suspicion" must be of criminal activity. Appellant requested an alternative instruction that included a reference to criminal activity; however, that alternative instruction also referenced "probable cause" instead of reasonable suspicion. Because Appellant's requested instruction need only call the trial court's attention to the error or omission in the charge, however, this is enough to constitute an objection. Thus, Appellant need only show some harm to warrant a reversal. In the alternative, Appellant can show egregious harm as well if the Court finds the requested instruction insufficient or that Appellant waived the objection to the charge.

The only real question in this case is whether Stewart had reasonable suspicion to detain Appellant, and that is the very issue upon which the jury was improperly instructed. Had the jury been properly instructed, Appellant could have been acquitted, especially since the jury did not receive a definition of "lawful arrest" in the charge and asked to see the video again in what is otherwise an open-and-shut case. The jury arguments reinforced the error, and Appellant's jury was comprised of five members (one of whom was the alternate) who affirmed during voir dire that the lawfulness of a detention does not matter—heightening the need for a correct instruction. Appellant suffered egregious harm and certainly some harm.

# ARGUMENT

## Standard of Review

Appellate review of charge error is a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex.Crim.App.1994). First, the Court decides whether error occurred. Next, the Court evaluates whether sufficient actual (as opposed to theoretical) harm resulted from the error to require reversal. *Id.* at 731-32; *Arline v. State*, 721 S.W.2d 348, 351 (Tex.Cr.App.1986). The level of actual harm required depends on whether the defendant objected or not. "If the error in the charge was the subject of a timely objection in the trial court, then reversal is required if the error is calculated to injure the rights of defendant, which means no more than that there must be *some* harm to the accused from the error. In other words, an error which has been properly preserved by objection will call for reversal as long as the error is not harmless." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (emphasis in original and internal quotations omitted). "The presence of *any* harm, regardless of degree, which results from preserved charging error, is sufficient to require a reversal of the conviction. Cases involving preserved charging error will be affirmed only if *no* harm has occurred." *Arline*, 721 S.W.2d at 351.

If the defendant fails to object, he may still raise the error but must show "egregious harm" rather than merely "some harm". *Almanza*, 686 S.W.2d at 171.

"Egregious harm", evidence of which need not be direct, *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996), occurs if the error denied the defendant a "fair and impartial trial," "go[es] to the very basis of the case," "deprive [s] [the defendant] of a 'valuable right,' " or "vitally affect[s] his defensive theory." *Almanza*, 686 S.W.2d at 172.

"Neither the State nor the defendant has a burden to prove harm." *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013).

Regardless of the level of harm, the review requires consideration of the charge as a whole, the state of the evidence, the arguments of counsel, and any other relevant considerations in the record. *Almanza*, 686 S.W.2d at 171.

## Application

### 1. Using the phrase "articulable suspicion" rather than "reasonable suspicion", and failing to state that the officer must suspect criminal activity, is error

Article 38.23 requires that "[i]n any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained." Tex. Crim. Proc. Code art. 38.23. "The terms of the statute are mandatory, and when an issue of fact is raised, a defendant has a statutory right to have the jury charged accordingly." *Murphy v. State*, 640 S.W.2d 297, 299 (Tex. Crim. App.

1982). Here, there was no question raised about whether the Article 38.23 instruction should have been given; rather, the question was which version.

Appellant requested an instruction that would have informed the jury that "our laws permits [sic] the stop, arrest, detention, and search of a person by a peace officer without a warrant only when probable cause exist [sic] to believe the individual has committed or is committing an offense." (I C.R. at 35). The requested instruction also would have apprised the jury that "probable cause", among other things, would "warrant a man of reasonable caution to believe that an offense has been or is being committed." (I C.R. at 35). This instruction was bench-filed on the day of trial at 9:22 am, (I C.R. at 35), before the formal charge conference (V R.R. at 40) (noting break taken from 9:19 a.m. to 9:53 a.m., then recording "Conference on Jury Instructions") and before the jury charge was read to the jury. (V R.R. at 40-41) (return to open court at 9:57 a.m. after the formal charge conference, and then charge read to the jury). As such, Appellant's requested charge was timely. Tex. Code Crim. Proc. art. 36.15; *Simmons v. State*, 493 S.W.2d 937, 940 (Tex. Crim. App. 1973) ("Objections to the court's charge or requested charges must be in writing before the charge is read to the jury.").

Instead of giving Appellant's instruction, the trial court gave one that simply stated, in relevant part, "You are further instructed that our laws permit the stop, detention, and limited search of a person by a peace officer without a warrant when

the police officers has an articulable suspicion." (I C.R. at 39). This is an incorrect statement of the law.

The law requires *reasonable* suspicion that crime is afoot: "specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that the person detained *is, has been, or soon will be engaged in criminal activity*." *Wade v. State*, 422 S.W.3d 661, 668 (Tex. Crim. App. 2013) (emphasis added and citations omitted). The court's Article 38.23 instruction thus contains two errors: first, it uses the phrase "articulable suspicion" rather than "reasonable suspicion"; second, and more importantly, it omits any reference to the requirement that that reasonable suspicion be based on specific, articulable facts that there is some criminal activity that has happened, is happening, or is about to happen. *Id*. As such, the court's Article 38.23 is erroneous. *Murphy*, 640 S.W.2d at 299 (terms of Article 38.23 are mandatory and the defendant has a statutory right to have the jury instructed under that article when it applies); *Stone v. State*, 703 S.W.2d 652, 654 (Tex. Crim. App. 1986) (commenting that the "court of appeals noted that there can be error in failing to instruct the jury according to the provisions" of Article 38.23); Tex. Crim. Proc. Code art. 36.14 (judge shall deliver to the jury "a written charge distinctly setting forth the law applicable to the case"); *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995) ("because the charge is the instrument by

53

which the jury convicts…[it] the charge must contain an accurate statement of the law and must set out all the essential elements of the offense.").

**Harm Analysis**

**1. Appellant's rejected written request for an alternative Article 38.23 instruction is sufficient to preserve error, making the question in the harm analysis whether Appellant suffered *some—any—*actual harm**

Even though Appellant's requested, but refused, Article 38.23 instruction was itself erroneous because it would have required probable cause rather than reasonable suspicion, *see Wade*, 422 S.W.3d at 667 (noting arrests require probable cause while investigative detentions need only be supported by reasonable suspicion), his requested instruction, as well as other parts of the record, still sufficiently called the trial court's attention to the error. *Stone v. State*, 703 S.W.2d 652, 654 (Tex. Crim. App. 1986) (erroneous requested special instruction plus other indications in the record enough to call trial court's attention to the omission in the charge); *Francis v. State*, 36 S.W.3d 121, 123 (Tex. Crim. App. 2000) (noting *Stone* applies to errors in the charge was well); Tex. Code Crim. Proc. art. 36.15 ("The defendant may, by a special requested instruction, call the trial court's attention to error in the charge, as well as omissions therefrom"). Therefore, Appellant's requested instruction constitutes a sufficient objection such that he is entitled to a reversal if he suffered some—that is, *any*—actual harm. *Arline*, 721 S.W.2d at 351.

In *Stone*, no Article 38.23 instruction was given despite the defendant's request. *Stone*, 703 S.W.2d at 654. However, the defendant's requested Article 38.23 instruction "was incorrect: it misstated the law both in directing the jury to consider probable cause, and then what to do if they failed to find probable cause; and, the charge constituted an impermissible comment on the weight of the evidence." *Id.* at 655. The Court noted that Article 36.15, "however, does not require precise wording in the requested instruction", and that the "requested charge must only be sufficient to call the trial court's attention to the omission in the court's charge." *Id.* (quotation and citation omitted). "The record show[ed], however, that despite the obvious errors in the requested charge, the trial court understood that appellant was objecting to the omission of an instruction regarding the officer's right to stop the vehicle. Thus, the trial court was apprised of appellant's objection to omissions in the charge." *Id.* Therefore, the defendant's incorrect Article 38.23 requested instruction was sufficient to require the trial court to give a correct Article 38.23 instruction because the record showed the trial court was apprised of the omission. Later, the Court of Criminal Appeals affirmed that "[w]hile *Stone* dealt with a complete omission of an instruction from the charge, the same concept applies to errors in the charge." *Francis*, 36 S.W.3d at 123. Hence, under *Stone* and *Francis*, Appellant's erroneous Article 38.23 instruction will satisfy Article 36.15, and thus allow Appellant to proceed under the "some

55

harm" standard rather than the "egregious harm" standard, so long as the record shows that he "apprise[d] the trial judge of the potential charge error." *Francis*, 36 S.W.3d at 123.

First, the judge rejected Appellant's instruction and gave a different one that mentioned "articulable suspicion". (I C.R. at 35; 39). As such, the judge was clearly aware that Appellant was complaining about the proper standard for evaluating the lawfulness of investigative detentions, and by rejecting the portion of Appellant's requested instruction that mentioned criminal activity, the judge was on notice of what the law requires: he could not have failed to have his attention called to the error in the charge. Tex. Code Crim. Proc. art. 36.15. Also, shortly before the charge conference Appellant moved for a directed verdict in which he argued that the "State never established a reason for the stop. There was no probable cause to stop the vehicle. And plus they never established any smidgen of evidence that would show that they had a reason to make contact with Mr. Salinas that night." (V R.R. at 39). Thus, it would have been clear to the trial court that Appellant did not believe the attempted arrest was lawful, and Appellant's requested Article 38.23 instruction stated at least one reason that arrest was not lawful: there was no reason to believe Appellant had committed an offense. (I C.R. at 35). Moreover, a significant portion of Appellant's voir dire was devoted to questioning the jury about illegal detentions, unlawful arrests, and

so forth, so the judge knew it was the principal issue in the case. (IV R.R. at 55-62). And Appellant argued in his opening statement that the police had "no probable cause to make contact with them that night", (V R.R. at 12), which again would suggest to the judge what the principal issue in the case was. All of this combined is enough to make the trial judge aware of the error in the Article 38.23 instruction he gave to the jury. *See Francis*, 36 S.W.3d at 123 ("Considering appellant's objection to the charge, his repeated attempts to require the State to elect, and the unique nature of the indictment and the incidents alleged in this case, appellant's objection to the jury charge was sufficient to apprise the trial judge of the potential charge error.").

Appellant's erroneous requested 38.23 instruction, combined with other facts in the record, constitutes a sufficient objection under *Stone* and *Francis* such that the lesser standard of "some" or "any" harm applies. *Arline*, 721 S.W.2d at 351.

### 2. Appellant did not waive his requested instruction, and even if he did, it only changes the harm analysis

When a defendant properly requests a special instruction pursuant to Article 36.15, and that requested instruction is denied, his requested instruction "shall be deemed to continue to have been urged by the party making or requesting the same unless the contrary is shown by the record." Tex. Crim. Proc. Code § art. 36.15. Here, after completing the charge, during the formal charge conference the judge

57

asked if either side had any objections to the charge, and Appellant's attorney parroted the State by responding, "Not from the Defense, Your Honor." (V R.R. at 40). The question is whether this waives the requested instruction.

In cases finding waiver of a previous objection to the charge, the defendant expressly agreed to the charge as written. *Lassere v. State*, 650 S.W.2d 203, 208 (Tex. App.—San Antonio 1983, pet. ref'd) ("The record discloses also that when the trial judge said, 'Okay. We will leave it [the instructional definition of theft], like it is,' the defense counsel agreed: 'Okay.' We find any objection was waived."); *Lopez v. State*, 860 S.W.2d 938, 941-942 (Tex. App.—San Antonio 1993, no pet.) (finding waiver where the defendant's attorney stated, "As finally drafted, we have no objection to the charge."). Appellant's attorney did not do so here: rather, he simply affirmed, in what was a formality and a courtesy, that the defense had no objections to the charge. (V R.R. at 40). It is highly unlikely that he intended to waive his detailed requested instruction on the vital—indeed, the only—issue in the case, especially as he was at pains to make this issue the crux of his case from opening statements through a motion for directed verdict. (V R.R. at 12; 39) (I C.R. at 35). And while in *Rasmussen v. State*, 608 S.W.2d 205, 211 (Tex. Crim. App. 1980) the Court found the statement, "No further objections", sufficient to show no "express waiver of objections previously perfected in compliance with" Article 36.15, the Court did not indicate this language is

required, and suggested, by using the term "express waiver", that something more than "Nothing from the Defense" is required.[19]   Indeed, that is what *Lopez* and *Lassere* present:  defendants who did not merely say "no objection", but rather (in essence), "I agree you may omit the language I just asked you to include", *Lassere*, 650 S.W.2d at 208, and "As finally drafted, we have no objection to the charge." *Lopez*, 860 S.W.2d at 941.  Appellant's attorney did not do so here:  Appellant's requested special instruction was not waived, and the "some harm" standard applies.

However, should the Court disagree, it does not mean that Appellant cannot raise the jury charge error; rather, it just requires him to show "egregious harm" rather than merely "some harm".  *Almanza*, 686 S.W.2d at 171.  "Egregious harm", evidence of which need not be direct, *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996), occurs if the error denied the defendant a "fair and impartial trial," "go[es] to the very basis of the case," "deprive [s] [the defendant] of a 'valuable right,' " or "vitally affect[s] his defensive theory." *Almanza*, 686 S.W.2d at 172.  While Appellant argues that "some harm" is the correct standard here, should the Court disagree, the error still caused Appellant egregious harm—and the analysis is the same. *Id*. at 171 ("In both situations the actual degree of harm

---

[19] It is also interesting that in *Rasmussen*, the judge asked "Do you have any *further* objections to the charge?" and the defendant responded, "No *further* objections." *Rasmussen*, 608 S.W.2d at 211 (emphasis added).  This suggests the defendant's attorney was merely repeating the language the judge refused—in other words, had the judge asked, "Do you have any objections to the charge?" the defendant's attorney would have responded, "No objections."

must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole.").

Appellant asks this court to review the charge error under whichever standard the Court believes applies.

### 3. Appellant suffered some harm or egregious harm

#### a. Charge as a whole

Although an *Almanza* analysis requires review of the whole charge, the sole issue in this case was whether Appellant fled from a lawful arrest or not—every other element of the crime is not in doubt. As such, it is critical that the instruction regarding what makes a detention lawful or unlawful be correct. Moreover, as detailed in Issue One and as should be considered, but need not be reiterated, here, Stewart had no specific, articulable facts that showed Appellant had been engaged in, was engaged in, or would be engaged in, a crime. The jury heard Stewart testify that he was "suspicious", but without being told that Stewart had to be suspicious that crime was afoot, nor that he had to have specific, articulable facts justifying that suspicion, the jury could have simply recalled that Stewart said he was suspicious and checked "articulable suspicion"—and thus the "lawful arrest" element of the offense—off with ease. Tex. Pen. Code § 38.04(a) (lawful arrest is

element of the offense of evading arrest or detention). Thus, the error itself here is entitled to great weight: it prevented Appellant from being acquitted and thus the error goes the "very basis of the case". *Almanza*, 686 S.W.2d at 172

Additionally, the jury was never properly instructed on what they needed to find to be true to find the "lawful arrest" element of the offense beyond a reasonable doubt. Tex. Pen. Code § 38.04(a) (I C.R. at 36-42). The import of a correction Article 38.23 instruction would be to apprise the jury that an unlawful detention means Appellant fled from an attempted *unlawful* arrest—meaning the State would have failed to prove an essential element of the offense beyond a reasonable doubt. *Rodriguez v. State*, 578 S.W.2d 419, 420 (Tex. Crim. App. 1979) (if the investigative detention preceding the attempted arrest is unlawful, the subsequent attempted arrest is unlawful, and the evidence is legally insufficient to prove the "lawful arrest" element of evading arrest or detention beyond a reasonable doubt). But the rest of the charge does not correct the error—indeed, the charge does not define "lawful arrest" at all. (I C.R. at 42); *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995) ("because the charge is the instrument by which the jury convicts…[it] the charge must contain an accurate statement of the law and must set out all the essential elements of the offense"; however, where the application paragraph failed define a culpable mental state that was correctly defined elsewhere, no error shown because the charge must be read

61

as a whole); *Vasquez v. State*, 389 S.W.3d 361, 367 (Tex. Crim. App. 2012) (error in the application paragraph can be corrected if the application paragraph "necessarily and unambiguously" refers to another, correct portion of the charge). So the need for a correct Article 38.23 was heightened: without it, the jury did not receive a proper instruction on one of the essential elements of the offense that the State needed to prove beyond a reasonable doubt, thereby failing to guide the jury properly in its fact-finding function and calling the integrity of the verdict into doubt. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994) ("Moreover, because the charge is so essential to the jury's deliberations, [i]t is clear that a charge must include an accurate statement of the law…When the trial judge fails to correctly charge the jury on the applicable law, the integrity of the verdict is called into doubt…an erroneous or an incomplete jury charge jeopardizes a defendant's right to jury trial because it fails to properly guide the jury in its fact-finding function.") (citations and quotations omitted). Thus, Appellant was "was deprived of his valuable right to have a jury determination of every element of the alleged offense and…this deprived him of a fair and impartial trial." *Riley v. State*, 447 S.W.3d 918, 931 (Tex. App.—Texarkana 2014, no pet.). This too shows "some harm" or "egregious harm". *Almanza*, 686 S.W.2d at 172 (egregious harm present if the error deprives the defendant of a valuable right or denies him a fair and

impartial trial). Any other errors in the charge appear inconsequential in this harm analysis.

### b. State of the evidence

Again, the entire case turned on whether the attempted arrest from which Appellant fled was lawful or not. The evidence is clear, as detailed in Issue One, that the attempted arrest was unlawful because the detention, whenever it occurred, was also unlawful. *Rodriguez*, 578 S.W.2d at 420. And the reason the detention was unlawful is for the very reason that was omitted from the Article 38.23 instruction: Stewart had no specific, articulable facts that, along with the reasonable inferences to be drawn from them, smelled of *criminal* activity. *Wade*, 422 S.W.3d at 668; *Derichsweiler v. State*, 348 S.W.3d 906, 917 (Tex. Crim. App. 2011). Thus, the trial court's erroneous 38.23 instruction went to the crux of the case: it prevented the jury from properly evaluating the evidence of the only element that was really in doubt. *Abdnor*, 871 S.W.2d at 731. Because this error affected the very basis of the case, this further counsels in favor of egregious harm or "some" harm. *Almanza*, 686 S.W.2d at 172 (harm is egregious if error goes to the very basis of the case or vitally affects a defensive theory); *Arline*, 721 S.W.2d at 351.

### c. Arguments of counsel

Appellant's closing argument is calculated towards convincing the jury that the attempted arrest was unlawful because Stewart had no reason to stop. (V R.R. at 44-48). For example: "I don't believe you're going to see headlights flashing at all." (V R.R. at 44). "What I see in the video is the officer is way down the road. If this was such a big concern, this guy flashing the lights, let me turn around right on the spot." (V R.R. at 44). "This is about constitutional rights. This is a right not to be jacked with by the police…There is no reason whatsoever for the officer to make contact with him except for—oh, he—the officer said, well, he could have robbed him, he could have done this." (V R.R. at 45). "I am going to dispute lawful…because I don't believe he had a reason…to stop him. There's no articulable suspicion about this. It says a vehicle pulled on the side of the road. If that's the case, every vehicle pulled on the side of the road is suspicious and we have the cops stopping everybody." (V R.R. at 46). "Now, I want to bring something to your attention here, underneath the jury charge instructions. Page 4, under 'lawful detention'. 'Articulable suspicion,' that could be anything. That's just too general of a term. That can be anything the officer—well, you know, well, through my training and experience I've known bank robbers to drive cars at night so I think I'll stop that vehicle. I know burglaries that take place in a car wash, so I think I'm going to stop the vehicle washing the car." (V R.R. at 46-47). "[I]t all

64

comes down to did the officer have reason to stop that vehicle or even come in there." (V R.R. at 48). This argument focuses on the key feature of the case but without correcting it. *Riley*, 447 S.W.3d at 930 (among the facts showing egregious harm was the fact that the State's closing argument reinforced jury charge error without correcting it). At best, it indirectly raises crime in the jury's mind by talking about burglaries and bank robbers, but the jury is never told that the officer must reasonably, based on specific facts, suspect crime of some sort. As such, Appellant's closing argument draws attention to the crux of the case without providing the jury the necessary guidance that the trial court omitted. *Abdnor*, 871 S.W.2d at 731 (the charge is supposed to guide the jury in fulfilling its fact-finding role). And because Appellant must argue the charge as given and not as it should have been given, the trial court's erroneous charge forced Appellant to make an incomplete argument to the jury. This counsels in favor of "some harm" or "egregious harm". *Almanza*, 686 S.W.2d at 172 (harm egregious if it goes to the very basis of the case or vitally affects a defensive theory).

The State's rebuttal closing argument similarly reinforces the error: rather than show what facts made Stewart suspicious that *crime* was afoot, the State simply argued that the facts would make one suspicious. (V R.R. at 49-50). But that is tantamount to saying that "articulable suspicion" means "curious" or "odd", which it plainly does not. *Crockett v. State*, 803 S.W.2d 308, 313 (Tex. Crim. App.

1991).  The State's closing argument also reinforces rather than dispels the error. *Riley*, 447 S.W.3d at 930 (among the facts showing egregious harm was the fact that the State's closing argument reinforced jury charge error without correcting it).

This factor again shows, at the very least, some harm if not egregious harm. *Almanza*, 686 S.W.2d at 172; *Arline*, 721 S.W.2d at 351.

### d. Other considerations in the record

The jury sent a note asking to the view the video again.  (I C.R. at 43). Because the elements of this offense were not really in doubt, except for the lawful arrest element (even Appellant's counsel in closing stated "you know, I'm not going to dispute some of these facts in the case") (V R.R. at 46), the jury could only have been trying to determine if that element was met or not.  Indeed, they took an hour and eleven minutes to return a verdict on what is otherwise an open-and-shut case.  (V R.R. at 53).  Because the jury must have been focused on whether the attempted arrest was lawful or not, they needed a correct instruction as to what would, and would not, make that attempted arrest lawful.  *Abdnor*, 871 S.W.2d at 731 (the charge is supposed to guide the jury in fulfilling its fact-finding role).  A jury fulfilling its fact-finding role without proper guidance from the court on how to fulfill that role favors a finding of some harm or egregious harm. *Almanza*, 686 S.W.2d at 172 (egregious harm if error denies the defendant a fair

and impartial trial, goes to the very basis of the case, deprives him of a valuable right, or vitally affects a defensive theory); *Arline*, 721 S.W.2d at 351.

During voir dire, Appellant's counsel spent much time questioning the jury about a lawful versus an unlawful arrest, and what verdict should be returned if the arrest is unlawful. (IV R.R. at 55-62). This would focus the eventual jury on the importance of that element. But more importantly, it reveals that the venire had a great deal of difficulty understanding that a person can run from a police officer and still not commit the offense: "Who agrees with 12 and 32 that basically you should stop no matter what, and that there is no issue as to whether or not it's a lawful detention or not?...No. 1, No. 5, No. 7…9, 14, 18, 21, 23, 24, 28, 33, 34, 36, and 17, 35, 50, 46, 42, 41, 40, and 37." Of these, Number 7 (Pamela Coone), Number 17 (Brandi Rountree), Number 21 (Kelli Gindrup), Number 28 (Robert Ferguson), and Number 37 (Terry Floyd)—all of whom agreed, in essence, that it does not matter if there is reasonable suspicion or not or a lawful arrest or not— ended up on Appellant's jury. (V R.R. at 76) (Floyd is the alternate) (I C.R. at 29-30). Presumably, if these jurors were truly to keep an open mind, they needed to receive a proper instruction on the law, and Appellant's only hope was a correct Article 38.23 instruction as to reasonable suspicion. This he did not receive, and this also shows some harm or egregious harm. *Almanza*, 686 S.W.2d at 172 (egregious harm if error denies the defendant a fair and impartial trial, goes to the

very basis of the case, deprives him of a valuable right, or vitally affects a defensive theory); *Arline*, 721 S.W.2d at 351.

## Conclusion

The Article 38.23 instruction that the jury gave was erroneous, and Appellant's requested instruction apprised the trial judge that he needed to give the correct one. Because he did not, Appellant need only demonstrate some harm. This he has amply done. In the alternative, Appellant has shown egregious harm as well. Appellant's conviction should be reversed and remanded for a new trial.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Appellant asks this Court to REVERSE the trial court's judgment and RENDER a judgment of acquittal. In the alternative, Appellant asks this Court to REVERSE and REMAND for a new trial.

Respectfully submitted:

/s/  Justin Bradford Smith
Justin Bradford Smith
Texas Bar No. 24072348

Harrell, Stoebner, & Russell, P.C.
2106 Bird Creek Drive
Temple, Texas 76502
Phone: (254) 771-1855
FAX: (254) 771-2082
Email: justin@templelawoffice.com

ATTORNEY FOR APPELLANT

## CERTIFICATE OF COMPLIANCE

I hereby certify that, pursuant to Rule 9 of the Texas Rules of Appellate Procedure, Appellant's Brief contains 14,956 words, exclusive of the caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, and certificate of compliance.

/s/ Justin Bradford Smith
Justin Bradford Smith

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2015, a true and correct copy of

Appellant's Brief was forwarded to the counsel below by eservice:

Gary W. Bunyard
Llano County Assistant District Attorney
P.O. Box 725
Llano, Texas 78639
Telephone: (325) 247-5755
Fax: (325) 247-5274
Email: g.bunyard@co.llano.tx.us

/s/ Justin Bradford Smith
Justin Bradford Smith